[Crim. No. 43708. Second Dist., Div. Seven. Aug. 31, 1984.]

In re JAVIER A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JAVIER A., Defendant and Appellant.

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, Thomas Bleauvelt and Monica Knox, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Howard J. Schwab and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—This case raises two issues. First, did the seizure of a photograph belonging to a nondefendant taint subsequent evidence obtained with the assistance of the photograph. Secondly, may a juvenile be constitutionally denied a right to jury trial in a delinquency proceeding where his

wardship and consequent loss of freedom depends upon proof beyond a reasonable doubt that he committed a specified felony.

We reluctantly affirm. Although we find the motion to suppress was properly refused, we also conclude appellant was denied his "inviolate" right to jury trial under article I, section 16 of the California Constitution. Only because of the compulsion of *Auto Equity* do we refrain from reversing and remanding for a new trial where Javier would enjoy the right to trial by jury. Instead we can only urge the Supreme Court to reconsider the 60-year-old decision which upheld the constitutionality of denying jury trials in juvenile proceedings.

## I. FACTS AND PROCEEDINGS BELOW.

Certain facts are undisputed. Shortly before 9 p.m. on August 17, 1982, three members of the "40th Avenue" juvenile gang were walking near the intersection of Jefferson and 35th Street in Los Angeles. A yellow Ford Torino sped into view and halted a few feet from the three gang members. A rifle emerged from the driver's side of the car. Three shots rang out. One of the gang members, Alberto "Smiley" Hermosillo, clutched his side and fell to the ground, wounded.

In dispute is the identity of the person who fired the shots. The investigation produced its first apparent breakthrough about an hour after the incident. Detective Lane heard about a young woman residing at a certain address who was the girlfriend of someone suspected in a recent shooting. Lane and other officers went to the address and learned the woman's name was Sylvia Franco. She was not there but staying at another residence. While at the first location, however, they obtained consent to search an adjacent apartment. During this search they found a photo album belonging to Franco. Upon reviewing the album, they found a picture of Franco and the defendant, Javier A., "The Puppet."

This photograph was given to Officer Randy Allen Garcia. He was assigned to CRASH, a police unit which monitors gang activities. Officer Garcia interviewed and obtained a signed statement from one of the victim's companions, Mario Rocha. According to this statement Rocha identified the defendant, Javier A., from this snapshot as the person who shot at him and his friends from the yellow Torino.

Detective Lane interviewed Sylvia Franco. According to the detective's version of what was said, Franco revealed she had been "jumped" a few

weeks earlier by some members of the 40th Street Gang. Franco then reportedly said her boyfriend, Javier A., told her the day before the shooting he had been looking for the "guys from 40th Street" but had not seen them yet. (At the trial, Franco claimed she had been referring to her brother not the defendant during her conversation with Detective Lane.)

Not long after talking with Sylvia Franco, Detective Lane also interviewed Blanca Orozco. He showed her the photograph from the album. She identified herself, Franco, and Javier in the picture. According to Detective Lane's version, Orozco told him Franco said her boyfriend "Puppet" had shot "Smiley." Purportedly Orozco also said Franco had warned her if either of them talked to the police they would be considered "rats" among the "Al Capone Gang." (At the trial, both Franco and Orozco denied Franco had told Orozco the defendant Javier was the one who shot "Smiley." However, Orozco backed away from this denial somewhat during cross-examination.)

On August 26, 1982, slightly over a week after the attempted murder, Detective Lane arrested Javier. After his arrest Javier signed a written statement and gave a tape recorded statement to the police. In these statements, Javier admitted he and some of his friends had driven into the "40th Street" neighborhood in his father's yellow Ford Torino. They were armed with a .22 caliber rifle Javier had obtained. The purpose was to avenge his girlfriend who had been beaten up in an attempted rape by members of the "40th Street" gang. Javier recognized "Smiley from 40th Street" among a group of people walking down Jefferson Boulevard. According to his statement to the police, Javier said, "Stop the car so I can shoot them." He then pointed the rifle out of the car window at "Smiley" and fired approximately four shots.[1]

The People filed a petition under Welfare and Institutions Code section 602 charging Javier, then age 15, with three counts of attempted murder. (Pen. Code, §§ 187, 664.) It was further alleged he used a firearm (Pen. Code, § 12022.5) and intentionally inflicted great bodily injury. (Pen. Code, § 12022.7.) Javier moved to suppress evidence under Welfare and Institutions Code section 700.1. This motion was denied. Javier also requested a jury trial. This request likewise was denied.

---

[1] At trial Javier denied participating in the shooting or even knowing "Smiley" or other members of the "40th Street" gang. He testified he made these statements to the police only because he was afraid and because the officers threatened that if he did not confess they would arrest his brothers, too.

After a nonjury trial the court found the petition true as charged except for the great bodily injury allegation. The court then declared Javier a ward of the court and committed him to the California Youth Authority for a maximum of 15 years and 8 months.

II. APPELLANT'S MOTION TO SUPPRESS EVIDENCE UNDER WELFARE AND INSTITUTIONS CODE SECTION 700.1 WAS PROPERLY DENIED.

Appellant argues his statement to the police should have been excluded as the fruit of an illegal search and seizure. We disagree. We conclude the trial court did not err in denying the appellant's motion to suppress, because (1) there was no illegal search and seizure of the photograph album under either the constitutional standard as made applicable to the states in *Mapp v. Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933] or under California's vicarious exclusionary rule and (2) furthermore even if the photograph album were illegally obtained, any fruits thereof were admissible under the "doctrine of inevitable discovery."

■ Preliminarily, in resolving whether the motion to suppress was properly denied, the reviewing court may "[o]nly [consider] the evidence before the trial court when it was called upon to rule on the motion . . . ." (*People v. Gibbs* (1971) 16 Cal.App.3d 758, 761 [94 Cal.Rptr. 458].) The parties stipulated to what amounted to a distilled version of the testimony presented at the *Dennis H.* hearing,[2] not the actual testimony. Therefore, the analysis of the merits of appellant's arguments must be limited to the evidence presented at the motion to suppress. These stipulated facts are:

(1) The investigating officers received information a young woman at a specified address was an associate of a person suspected in a recent shooting; (2) at that location the officers determined the young woman was staying with a friend or relative by marriage; (3) the officers made a consensual search of an adjacent apartment; (4) during the search the officers found a photo album; (5) the officers were informed the album did not belong to the person who consented to the search, but in fact belonged to the young woman; (6) the young woman never consented to the search and removal from the apartment of her photo album; (7) the contents of the photo album were subsequently reviewed and shown to witnesses; (8) Javier was identi-

---

[2]A hearing under *In re Dennis H.* (1971) 19 Cal.App.3d 350 [96 Cal.Rptr. 791] adjudicates whether an order of detention should be issued against the minor prior to trial on the merits.

fied from the photo album as the boyfriend of the young woman, Sylvia Franco; (9) Sylvia told detectives Javier was her ex-boyfriend and he had told her a couple days before that he had been looking for dudes from the 40th Street Gang so he could get even with them for assaulting her sometime earlier and (10) this was the first time officers learned Javier's true and correct name. Based on these facts, the trial court ruled that under Proposition 8 enacted in June 1982 appellant had no standing to assert a third party's Fourth Amendment rights against an unreasonable search and seizure and the doctrine of inevitable discovery was applicable.

A. *There Was No Unreasonable Search and Seizure of Ms. Franco's Photo Album.*

■ The Fourth Amendment of the United States Constitution and article I, section 13 of the California Constitution both guarantee the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. To effectuate these fundamental constitutional guarantees, the Supreme Court has held that "evidence seized during an unlawful search could *not constitute proof against the victim of the search. Weeks* v. *United States* [1914] 232 U.S. 383." (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 484 [9 L.Ed.2d 441, 452-453, 83 S.Ct. 407], italics added; *Mapp* v. *Ohio, supra,* 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) The United States Supreme Court only excludes evidence unlawfully obtained from the defendant himself not that resulting from a search of another person. (*Rakas* v. *Illinois* (1978) 439 U.S. 128 [58 L.Ed.2d 387, 99 S.Ct. 421].) However, in *People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855], the California Supreme Court adopted the so-called vicarious exclusionary rule. This allows a defendant to attack the search and seizure of the person or property of a third party. The rationale for expanding the exclusionary rule beyond the scope mandated by the United States Supreme Court was to enhance the deterrent effect of the exclusionary rule by preventing law enforcement officers from violating the rights of third parties and thereby evading the exclusionary rule. (*People* v. *Martin, supra,* 45 Cal.2d 755, 760.)

The continuation of California's vicarious exclusionary rule as well as other independent state grounds which permit suppression of evidence otherwise permitted in federal court is under challenge by the constitutional mandate of Proposition 8. Proposition 8 resulted in the addition to the California Constitution of article I, section 28, subdivision (d), which provides that "relevant evidence shall not be excluded in any criminal proceeding."

Because of the uncertainty of the impact of this constitutional provision,[3] we shall consider the applicability of both California law prior to the enactment of Proposition 8 and the constitutional standard which would be applicable should article I, section 28, subdivision (d) of the California Constitution be adjudged applicable. We conclude that regardless of which standard is applied the trial court did not err in denying the appellant's motion.

1. *Analysis under California law prior to the enactment of Proposition 8.*

As the vicarious exclusionary rule would allow Javier to challenge the reasonableness of the search and seizure of Ms. Franco's photo album, we now consider the results of such a challenge. The issue presented is whether Ms. Franco's legitimate expectation of privacy was violated by the search of her album left in Mr. Macedo's apartment. ■ The proper standard of review on appeal is to uphold " 'the trial court's findings . . . whether express or implied, . . . if they are supported by substantial evidence.' " And meet " 'the constitutional standard of reasonableness.' " (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

The record discloses Mr. Macedo advised the police Ms. Franco was residing "upstairs . . . temporarily for a week or two until [she] could find a place to live." However, there was no testimony which clearly delineated the relationship between Sylvia and Mr. Macedo or the degree of control which Mr. Macedo had over the album.

The court's analysis of the situation in which there is joint ownership and control of property is analogous to the instant case in which there is a bailment. In *United States* v. *Matlock* (1974) 415 U.S. 164 [39 L.Ed.2d 242, 94 S.Ct. 988], the court considered whether consent given by the occupant of a house to search a room occupied by herself and the defendant "legally sufficient to render the seized materials admissible in evidence at the respondent's criminal trial." (*Id.* at p. 166 [39 L.Ed.2d at p. 246].) ■ The court held "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (*Id.* at p. 171 [39 L.Ed.2d at pp. 249-250].) The effectiveness of the consent depends upon whether there is "mutual use of the property by persons generally having joint access or control for most purposes . . . and that the

---

[3]This issue is currently pending before the California Supreme Court. (*In re Lance W.* (Cal.App.) hg. granted Feb. 22, 1984 (Crim. 23551).)

others have assumed the risk that one of their number might permit the common area to be searched." (*Id.* at p. 171, fn. 7 [39 L.Ed.2d at p. 250].)

In *Frazier* v. *Cupp* (1969) 394 U.S. 731, 740 [22 L.Ed.2d 684, 693-694, 89 S.Ct. 1420], the defendant challenged the admissibility of evidence found during a search of a duffel bag left at his cousin's house which he and his cousin used and which his cousin consented to be searched. In holding the joint use of the duffel bag gave his cousin the authority to consent to the search, the court was unwilling to engage in the "metaphysical subtleties" raised by the defendant's claim that his cousin only had permission to use one compartment within the bag. Because the defendant had allowed his cousin to use the bag, and had left it in his house, the defendant assumed the risk his cousin would let someone else examine it.

Therefore, in bailment, whether the bailee, who does not own the property but has lawful possession of it, can consent to a police search of the property which is effective against the bailor depends upon whether the nature of the bailment is such that the bailor has assumed the risk. (*Frazier* v. *Cupp, supra,* 394 U.S. 731, 740 [22 L.Ed.2d 684, 693-694].) Crucial factors are the extent to which the bailor has surrendered control and the length of the bailment. ■ In the case at bench, there is no testimony or stipulation as to the extent of Mr. Macedo's control over the album or how long he had held it. The album was in plain sight on a dresser in Mr. Macedo's one-room apartment. The album was not locked. We too do not wish to engage in "metaphysical subtleties" that Macedo only had authority to allow certain persons to view Ms. Franco's photographs. Rather, we believe the trial court might have reasonably inferred from Mr. Macedo's action of showing the officers Ms. Franco's picture that he had the requisite degree of control over it.[4]

The trial court's ruling may also be sustained under the "apparent authority doctrine" set forth in *People* v. *Gorg* (1955) 45 Cal.2d 776 [291

---

[4]Although the decisions of the federal district court are not binding on California courts (*People* v. *Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129]; *Gould* v. *People* (1976) 56 Cal.App.3d 909, 919, footnote 6, [128 Cal.Rptr. 743]), in *United States* v. *Walker* (9th Cir. 1978) 575 F.2d 209, the court confronted a similar situation. Ms. Stearns, the coowner of some photographs, in which the defendant in *Walker* claimed an interest, entrusted their care to a Mr. Seibert. He had no limitation on his control over the photographs. The photographs were seized by the police. In allowing the photographs to be admitted into evidence against the defendant, the court concluded that "Stearns assumed the risk that the messenger might consent to let anyone inspect or examine [the photographs]. Where one with authority to do so consents to a search, the fact of consent validates the intrusion, and, by definition, there is no improper invasion of any expectation of privacy that is recognized by the law." (*Id.* at p. 212.) Arguably, therefore, Ms. Franco assumed the risk that during the course of a consensual search of Mr. Macedo's apartment, he might show her album to the police.

P.2d 469]. The defendant in *Gorg* challenged the admissibility of evidence discovered during a search of the room he occupied in the home of a third person. The third person consented to the search, not the defendant. The court found the defendant's consent unnecessary because where the third party reasonably appeared to the police to have the authority to consent, there could be no unreasonable police search.

In the instant case, the doctrine's applicability is arguably diminished because Mr. Macedo initially stated the album belonged to Ms. Franco and only showed the officers her picture at their request. It might have been inferred the police were on notice from Mr. Macedo's initial remarks he had no apparent authority to show the album to them. However, the trial court also could reasonably infer Mr. Macedo's exercise of control over the album in response to the police officers' remarks estopped him from denying he had control over it and created an apparent authority upon which the police could reasonably rely.

We conclude, therefore, that there was sufficient evidence before the trial court from which it could reasonably infer the search and seizure of Ms. Franco's photo album was reasonable and we decline to disturb its ruling.

2. *Analysis under the constitutional standard applicable if Proposition 8 abrogates California's vicarious exclusionary rule.*

The Supreme Court has consistently interpreted the mandate of the framers to mean " 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' " (*Rakas* v. *Illinois, supra,* 439 U.S. 128, 133-134 [58 L.Ed.2d 387, 394]; see *Brown* v. *United States* (1973) 411 U.S. 223, 230 [36 L.Ed.2d 208, 214-215, 93 S.Ct. 1565]; *Simmons* v. *United States* (1968) 390 U.S. 377, 389 [19 L.Ed.2d 1247, 1251, 88 S.Ct. 967]; *Wong Sun* v. *United States, supra,* 371 U.S. 471, 492 [9 L.Ed.2d 441, 458]; cf. *Silverman* v. *United States* (1961) 365 U.S. 505, 511 [5 L.Ed.2d 734, 738-739, 81 S.Ct. 679, 97 A.L.R.2d 1277]; *Gouled* v. *United States* (1921) 255 U.S. 298, 304 [65 L.Ed. 647, 650, 41 S.Ct. 261].) In ascertaining whether Javier had a legitimate expectation of privacy in Sylvia Franco's photograph album, the scope of our analysis may encompass the "totality of the circumstances." (*Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 641, 100 S.Ct. 2556].)

Applying these criteria to the instant case, we note first the status of the relationship between Javier and Sylvia Franco is unclear. She is either his girlfriend or ex-girlfriend. Further, there is no indication of any relationship between Javier and Mr. Macedo, the occupant of the apartment in

which Ms. Franco's album was found. Secondly, no evidence was put forth Javier had any arrangement with either Franco or Macedo to prevent persons from entering Mr. Macedo's apartment or from viewing the photographs. Thus the album in which Javier claims a privacy interest was in an apartment which it can be inferred he neither had access to nor ability to exclude others from. Moreover, the album itself was stipulated to be the property of Ms. Franco not the defendant.

The defendant had no reasonable expectation of privacy in the premises searched, Mr. Macedo's apartment. He likewise had no reasonable expectation of privacy in the personal property seized, Ms. Franco's album. Accordingly if the federal rule applies, the defendant is without standing to challenge admission of any evidence derived from this search and seizure.

B. *Javier's Statements to the Police Are Admissible Under the Doctrine of Inevitable Discovery.*

An alternative ground for the admissibility of Javier's statements to the police is the doctrine of inevitable discovery. ■ In determining whether evidence is the "fruit of the poisonous tree" and therefore inadmissible, the correct inquiry is " ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " (*Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 422 [96 Cal.Rptr. 455, 487 P.2d 1023]; *Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455], quoting Maguire, Evidence of Guilt (1959) p. 221.)

■ Assuming arguendo the photograph album was illegally seized, there are three recognized methods by which evidence that is the "fruit of the poisonous tree" may be admissible despite its illegal origins: (1) if there was an independent source for the evidence, (2) if it would have been available due to inevitable discovery, (3) or if the connection between the source and the evidence has been sufficiently attenuated. (See 3 LaFave, Search and Seizure (1978) § 11.4, pp. 612-680.) The inevitable discovery rule is "a variation upon the ' "independent source" ' theory, 'but it differs in that the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully.' [Citation.]" (*People* v. *Saam* (1980) 106 Cal.App.3d 789, 797 [165 Cal.Rptr. 256].) The rationale of the doctrine is " "to prevent unjustly granting criminals immunity from prosecution.' " (*People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 673 [145 Cal.Rptr. 795].) The People may meet their burden of proof by establishing "that the infor-

mation obtained illegally would have been discovered anyway by the police during the normal course of a lawfully conducted investigation. [Citations.]" (*People* v. *Farley* (1979) 90 Cal.App.3d 851, 866 [153 Cal.Rptr. 695]; *Nix* v. *Williams* (1984) — U.S. — [81 L.Ed.2d 377, 104 S.Ct. 2501].)

We find no exploitation of the alleged illegal search and seizure in the instant case. Prior to the discovery of the photograph album, the officers had "received information that a young woman at a specified address was an associate of the person suspected of a recent shooting." The officers then "proceeded to the specified address and at that location determined that the young woman was staying with a friend or relative by marriage." It may be inferred the police had a certain person in mind who was closely associated with the suspect and had obtained sufficient information to locate this individual prior to discovering the album. Therefore, regardless of whether the officers found her picture in an album, Ms. Franco would have been investigated and interviewed.

Appellant next argues that because Ms. Franco was a "friend" of the suspect, it is not inevitable she would have made a statement implicating him in a crime. "Sometimes the judgment as to whether discovery of the challenged evidence was inevitable requires a determination not of what law enforcement agents would otherwise have done with what results, but instead what some other person would have done. This is typically the case when the question is whether a crime victim's testimony may be admitted where that victim was located by reliance upon illegally procured evidence. Where the circumstances of the case are such that it may fairly be said that the victim could be expected to come forward 'without being prodded into doing so as might conceivably be necessary in the case of a recalcitrant witness who is not a victim of the crime,' the testimony is properly admitted on an 'inevitable discovery' theory. Such a result is unlikely to be justified 'where the witness is a friend of the accused.' [Citation.]" (3 LaFave, Search and Seizure (1978) A Treatise on the Fourth Amendment, § 11.4, p. 627.)

█ In the instant case, however, Ms. Franco need not have voluntarily come forward, because police were aware of her identity. In addition, there was no indication she would have been uncooperative to the police. Furthermore, the stipulation does not state Ms. Franco made any identification of Javier from the photograph or that the photo influenced her statements in any way.[5] The parties stipulated Ms. Franco said that Javier A. had told

---

[5]We conclude that because the issue of whether Mario Rocha's extrajudicial identification of Javier should have been suppressed was not before the trial court, it is not properly before us and we decline to reach the merits of appellant's argument. (*Wilder* v. *Superior Court* (1979) 92 Cal.App.3d 90, 94 [154 Cal.Rptr. 494].)

her a couple days before that he had been looking for dudes from the 40th Street Gang so he could get even with them for assaulting her sometime earlier and that this was the first time that the officers had learned the minor's true and correct name. Javier's name and association to the crime therefore were not gleaned from the use of the photograph. Instead they were derived from an interview with a witness who would have been found in the normal course of the investigation anyway. It is not necessary that the People show that the police would have certainly discovered the tainted evidence, rather, it is only necessary to show a reasonably strong probability that they would have. (*People v. Superior Court (Tunch), supra,* 80 Cal.App.3d 665, 681.)

### III. MINORS CHARGED WITH FELONY OFFENSES IN JUVENILE COURT ARE ENTITLED TO TRIAL BY JURY BUT AUTO EQUITY DOES NOT PERMIT THIS COURT TO REVERSE THE JUDGMENT AGAINST JAVIER.

The California juvenile's claim to a right to jury trial need not depend on the due process grounds rejected by the United States Supreme Court.[6] Instead in this state it can rest squarely on a separate provision of the California Constitution, a part of the Declaration of Rights, which guarantees trial by jury to all Californians. (Cal. Const., art. I, § 16.)[7]

One does not have to be an adult to enjoy this right. Minors have access to trial by jury the same as any adult in nearly every legal proceeding. If injured in an automobile accident, for instance, a child's right to recover will be decided in an action where jury trial is available. Similarly, if a juvenile is declared "unfit" and finds himself in criminal court, he has the same opportunity to demand a jury as any adult defendant.

On the other hand, in certain *types* of proceedings—dissolutions and most equitable actions, for example—neither juveniles nor adults are entitled to trial by jury. If juvenile delinquency cases were deemed to be criminal

---

[6]*McKeiver v. Pennsylvania* (1971) 403 U.S. 528 [29 L.Ed.2d 647, 91 S.Ct. 1976]. See also *In re Mitchell P.* (1978) 22 Cal.3d 946, 951-953 [151 Cal.Rptr. 330, 587 P.2d 1144] for dictum stating *McKeiver* holds neither due process nor equal protection support a right to jury trial in juvenile delinquency cases. It should be noted, however, the *McKeiver* decision only upheld the denial of jury trial because it found the Pennsylvania juvenile court retained enough unique features to be something other than a "criminal prosecution." If the California juvenile court process, on the other hand, has evolved into a "criminal prosecution," federal due process as well as the California Constitution would require that the accused enjoy the right to trial by jury. (See pp. 968-969, *post.*)

[7]Article I, section 16 reads in pertinent part as follows: "Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict. A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute."

proceedings, the juvenile accused clearly would be constitutionally guaranteed a right to jury trial. (*Duncan* v. *Louisiana* (1968) 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444].) ▆▆▆ But the present California Juvenile Court Law purports to be something else. In this court, juveniles are not convicted of crime and on that basis sentenced as criminals. Instead they are found to have committed criminal acts and on that basis declared to be wards of the court.[8] Wardship actions, in turn, are deemed to be part of the equity jurisdiction of the court where ordinarily there is no right to jury trial.

This raises two issues under article I, section 16 of the California Constitution: First, may a wardship be declared on the basis of the minor's commission of a felony without a trial by jury or is this a type of proceeding where jury trial must be afforded? Secondly, assuming jury trial could be denied in a true wardship action, have California juvenile delinquency actions metamorphized into criminal proceedings where the juvenile accused clearly must be given the opportunity for a jury trial? We conclude a juvenile delinquent *cannot be declared a ward of the court* for alleged felonious conduct unless and until he is found to have engaged in that conduct at a hearing where he enjoys the right to jury trial. Alternatively, as an independent and sufficient constitutional ground for our opinion, we further conclude *juvenile delinquency actions indeed have become "criminal prosecutions"* thus entitling juvenile delinquents charged with felonious acts to a trial by jury. With respect to both these grounds, we consider whether stare decisis nonetheless requires we follow a 60-year-old California Supreme Court decision which held alleged delinquents did not have a right to jury trial in juvenile court proceedings.

A. *California Juveniles Are Entitled to Trial by Jury in Delinquency Proceedings Because in 1850 England Juveniles Could Not Be Declared Wards of the Court on the Basis of Their Commission of Felonies Without a Trial by Jury.*

We begin with the uncompromising language of the California Constitution: "Trial by jury is an *inviolate right* and shall be *secured to all.*" (Art. I, § 16, formerly art. I, § 7 of the original Constitution, italics added.) These words admit of no exceptions. The absolute guarantee is part of the Declaration of Rights and thus available to everyone appearing in California

---

[8]"Any person who is under the age of 18 years when *he violates any law of this state or of the United States* or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." (Welf. & Inst. Code, § 602, italics added.)

courts. It is the individual's personal right to be exercised—or waived—solely by that person.

1. *The right to jury trial extends to all categories of cases where that right existed in England as of 1850.*

One hundred and one years after enactment of the Constitution the California Supreme Court pulled together the strands of several lines of authority which had sought to define various facets of the jury trial guarantee.[9] The result is the most authoritative, comprehensive statement defining the categories of cases where litigants are entitled to trial by jury to be found in California law. In the leading case of *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 [231 P.2d 832], the court articulated that test to be whether the type of case at issue was identical to—or similar to—those categories of cases in which litigants enjoyed the right to jury trial under the English common law as of the time California became a state in 1850. While justifying a right to jury trial in forfeiture proceedings of vehicles used in narcotics trafficking, the Supreme Court presented a complete exposition of the test: " 'The right to trial by jury guaranteed by the Constitution is the right as it existed at common law at the time the Constitution was adopted. [Citation omitted.] The common law at the time the Constitution was adopted includes not only the *lex non scripta* but also the written statutes enacted by Parliament. [Citation omitted.] . . . It is necessary, therefore, to ascertain what was the *rule of the English common law upon this subject in 1850.'* " (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283, 286-287, second italics added.)

*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283 not only established the English common law as it stood in 1850 defines the right to

---

[9]Among the earlier Supreme Court cases dealing with various facets of the jury trial guarantee are *Smith* v. *Rowe* (1853) 4 Cal. 6 [jury trial right does not attach in types of cases where unavailable at the common law, especially equity]; *Koppikus* v. *The State Capitol Commissioners* (1860) 16 Cal. 248 [jury trial applies to civil and criminal cases where "an issue of fact is made by the pleadings"]; *Cassidy* v. *Sullivan* (1883) 64 Cal. 266 [28 P. 234] [jury trial right does not extend to divorce proceedings since no such right at common law in England]; *People* v. *Powell* (1891) 87 Cal. 348 [25 P. 481] [common law right was preserved and made inviolate including its essential incidents]; *Donahue* v. *Meister* (1891) 88 Cal. 121 [25 P. 1096] [jury trial right applies to legal issues implicated in equitable action]; *People* v. *Wong Ark* (1892) 96 Cal. 125 [30 P. 1115] [right to jury trial includes all essential incidents of English common law including right to appeal denial of challenge of juror for bias]; *Ex Parte Wong You Ting* (1895) 106 Cal. 296 [39 P. 627] [jury trial right applies in all "criminal proceedings" including offenses unknown to English common law]; *Estate of Dolbeer* (1908) 153 Cal. 652 [96 P. 266] [no jury trial right in probate proceedings since none under English common law]; *People* v. *Martin* (1922) 188 Cal. 281 [205 P. 121, 21 A.L.R. 1399] [whether jury trial must take place in vicinage of offense depends upon nature of charge and where it was tried under common law]; *Pomeroy* v. *Collins* (1926) 198 Cal. 46 [243 P. 657] [jury trial does not apply in actions to cancel an instrument because they were equitable actions under English common law].

jury trial which remains "inviolate" in California, it held the status of the English common law at that time was a matter of "historical fact."

" 'It is the right to trial by jury as it existed at common law which is preserved; and *what that right is, is a purely historical question, a fact* which is to be ascertained like any other social, political or legal fact. *The right is the historical right enjoyed at the time it was guaranteed by the Constitution.*' " (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283, 287, italics added.)

A third firm holding of *People* v. *One 1941 Chevrolet Coupe* likewise affects our excursion into English legal history. The Supreme Court made it clear in *One 1941 Chevrolet Coupe* the Legislature may not relabel cases which were heard at the common law in 1850 England as cases now to be heard in equity or in special proceedings and thereby deprive litigants of a right to jury trial. " 'The right to a trial by jury cannot be avoided by merely calling an action a special proceeding or equitable in nature. If that could be done, the Legislature, by providing new remedies and new judgments and decrees in form equitable, could in all cases dispense with jury trials, and thus entirely defeat the provision of the Constitution. The Legislature cannot convert a legal right into an equitable one so as to infringe upon the right of trial by jury. The provision of *the Constitution does not permit* the Legislature to confer on *the courts the power of trying according to the course of chancery any question which has always been triable according to the course of the common law by a jury.* [Fns. omitted.]' " (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283, 299, italics added.)

These three principles have been amplified in subsequent decisions. (See, e.g., *Dorsey* v. *Barba* (1952) 38 Cal.2d 350 [240 P.2d 604]; *People* v. *Amor* (1974) 12 Cal.3d 20 [114 Cal.Rptr. 765, 523 P.2d 1173]; *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742]; *McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1 [138 Cal.Rptr. 459, 564 P.2d 1]; *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1 [151 Cal.Rptr. 323, 587 P.2d 1136]; *Ripling* v. *Superior Court* (1952) 112 Cal.App.2d 399 [247 P.2d 117]; *Tibbitts* v. *Fife* (1958) 162 Cal.App.2d 568 [328 P.2d 212]; *Southern Pac. Transportation Co.* v. *Superior Court* (1976) 58 Cal.App.3d 433 [129 Cal.Rptr. 912].) But these three holdings of *People* v. *One 1941 Chevrolet Coupe* remain intact.

2. *As of 1850, an English minor could not be declared a ward of the court—or be sent to a reform school or prison—on the basis of his commission of a felony unless he had been afforded a right to trial by jury.*

The English placed a high value on trial by jury and vigorously resisted attempts to erode its coverage. Indeed in 1780 Blackstone eulogized the jury

as the institution which separated the English government from the failed democracies of the past. "[T]rial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases! . . . [I]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by unanimous consent of twelve of his neighbors. . . . A [right] that I may venture to affirm has, under Providence, secured the just liberties of this nation for a long succession of ages. And therefore a celebrated French writer, who concludes, that because Rome, Sparta, and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta, and Carthage, at the time when their liberties were lost, were strangers to the trial by jury.

"· · · · · · · · · · · · · · · · · · · · · ·

"It is, therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity and himself, . . . to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time imperceptibly undermine this best preservative of English liberty." (3 Blackstone, Commentaries on the Laws of England (1780) pp. 379, 381.)

Given the honored place the right to jury trial occupied among English legal philosophers and policy makers in the decades before 1850, it would surprise were we to find English law authorizing any court, including chancery, to take away a minor's freedom because of alleged criminal offenses without a jury trial. And indeed we find no evidence it did and a great deal it did not.

Despite the *parens patriae* relationship between the English government and its minor citizens, those same minors enjoyed an unequivocal right to jury trial when accused of crime in the law courts. Blackstone, for instance, reminds us an English child could be convicted only if found not only to have committed the criminal act but to be "capable of guile" by a "court *and jury.*" (4 Blackstone, Commentaries on the Law of England, *supra,* p. 23, italics added; see also Platt, The Child Savers (2d ed. 1977).)

The California juvenile delinquency law purports not to be a criminal proceeding but rather a form of equitable proceeding, an action to declare a minor a "ward of the court" pursuant to equity's *parens patriae* jurisdiction. Ordinarily the right to jury trial did not attach in equity under English common law. But the question remains whether this particular specie of

wardship—finding a minor had committed a crime and on that basis making him a ward of the court—was tried "according to the course of chancery" in 1850 England. Or was it instead "triable according to the course of the common law by a jury." Significantly, none of the English chancery cases relied upon in American decisions to uphold denial of jury trials in juvenile proceedings[10] involved a juvenile offender. Nor did any of these English cases claim *parens patriae* empowered courts of equity to decide without a jury that a juvenile had committed a crime and then declare him a ward of the court. Instead these English cases were ordinary civil guardianship and custody cases. Nor does our own research or that of the parties[11] point to any pre-1850 English case allowing English courts of equity to determine a child had committed an offense and on that basis declare him a ward of the court. As we shall soon see, in 1850 England the decision whether a minor had committed a crime first had to be made through a trial by jury in the law courts. Only then could the equity courts determine whether he should be made a ward of the court.

Indeed there is much which happened in the decades preceding 1850 to support the conclusion English law granted juveniles a right to jury trial before the state could restrict their liberty for any longer than three months because of criminal acts they were alleged to have committed. Moreover, English law would not allow this right to yield to generous aspirations or promises of beneficial treatment for juvenile offenders. As it turns out those decades witnessed proposals and discussions specifically addressed to this very question.[12]

a. *As of 1850, English common law had specifically rejected attempts to deprive juvenile offenders of their right to jury trial in return for the purported benefits of separate juvenile courts, "Fatherly Treatment" and "Reform Schools."*

In 1815 the Select Committee on the State of the Police of the Metropolis heard testimony from Francis Hobler, a magistrate, who proposed a separate court for offenders under 14, at least those who only committed acts of thievery. As proposed, this court would have had most of the attributes of a present day juvenile court including trial by judge rather than jury. "I

---

[10]See cases discussed at page 941, *post.*

[11]We specifically requested the parties to search for any pre-1850 English cases supporting this proposition. (See p. 942, *post.*)

[12]We apologize for the length and detail of the discussion of English common law developments which follows. However, most of the sources quoted are not readily available. Thus, other courts and lawyers would not be in a position to consult their own libraries for elaboration if documents were merely cited in this opinion. Moreover, it is difficult to convey the full flavor of what was happening in England on this jury trial issue during the mid-19th century without rather extensive quotations from proposals, acts, and debates.

think if the magistrates were entrusted with the sort of parental authority to whip them a little and keep them upon bread and water and if the child had parents . . . to send him back to them it would prove highly advantageous; and I can see that the magistrate being a gentleman of years and experience could not be supposed to be capable of abusing an authority of this sort for as men and as parents they must feel for the situation of such characters." (Report of the Select Committee on the State of the Police of the Metropolis, 1815, quoted in Parsloe, Juvenile Justice in Britain and the United States (1979) p. 112.)

In 1827 another magistrate, Sir John E. Eardley Wilmot, circulated letters among his fellow magistrates urging a similar separate court with an equally generous motive. "The remedy therefore that I would propose is . . . the immediate and summary cognizance of offenses committed by the youthful depredator; to be heard before an intermediate tribunal where petty offences may be instantly proceeded against and punished, without sending the offender to undergo the stigma and contamination of a public prison, the publicity of trial, and all those evils which infallibly result from early imprisonment. . . . I would empower [this variety of juvenile court] to punish the young culprit by whipping, confining him in an asylum set apart for this purpose, or by discharging him without punishment at all. . . .

"[T]he youthful delinquent . . . will find already appointed as the legal guardians of his infancy, those who by judicious restraint and by well-timed instruction will supply the place of his own relatives. It will be an 'act for appointing guardians for the deserted and friendless', rather than an addition to our Criminal Code; and instead of being a law of punishment, will be the dispenser of blessings." (Sir John E. Eardley Wilmot, A Letter to the Magistrates of England, p. 15, quoted in Parsloe, Juvenile Justice in Britain and the United States, *supra,* pp. 112-113.)

In 1836 a Royal Commission was appointed "to consider whether it was advisable 'to make any distinction in the mode of trial between adult and juvenile offenders, and if not, whether any class of offenders can be made subject to a more summary proceeding than trial by jury.' The Commission reported that *a distinction in the mode of trial would not be advisable,* except by increasing the summary jurisdiction of Magistrates." (Rep. of 1927 Departmental Committee on the Treatment of Young Offenders (1938) p. 11, italics added.) Nonetheless, this and similar agitation resulted in a legislative proposal in 1840. In that year the same Sir John E. Eardley Wilmot who had circulated the 1827 proposal managed to introduce a bill to create a separate court for children under the age of 16 who were charged with committing minor offenses. (A Bill to Authorize the Summary Conviction of Juvenile Offenders in Certain Cases of Larceny and Misdemeanor,

and to Provide Places for Holding Petty Sessions of the Peace. British Sessional Papers—House of Commons 1840 (5 Feb. 1840—3 Victoria) (48) II, p. 687.)[13]

Trials would have been before a judge without jury. The juvenile offenders in turn would have been granted a boon. Instead of the years in prison an adult would suffer for the same offenses, the minors would be dealt with by magistrates who were enjoined to treat them as would a: ". . . father over his son—a moral authority, which could enable them to bring juvenile offenders under a course of moral training and discipline which should have the effect of reclaiming them to the paths of honesty and industry. The bill was a merciful bill, its object being to provide for those who were without natural parents and guardians, national parents and guardians, in order to save them from being sent to gaols to be contaminated and ruined." (52 Parliamentary Debates, Series 3 (Feb. 7—Mar. 23, 1840) pp. 652-653.)

This bill actually passed the House of Commons. But it did not become law. It was defeated by the House of Lords which found it "unconstitutional." As one historian reports: "The bill denied to children the right of jury trial. General Johnson said: '[T]here would be no end to juvenile offences, juvenile gaols, juvenile courts and all that, without the benefit to the pris-

---

[13]"WHEREAS it has been found by experience that great evils have arisen from the commitment for Trial of Offenders of tender age, accused of Larceny and Misdemeanors, whereby such early imprisonment has tended to harden them in vice, and to render any attempt at reforming them more difficult and unavailing: [¶] And whereas it is expedient to provide a summary mode of proceeding and adjudicating against such Offenders, instead of that now in force; [¶] BE IT THEREFORE ENACTED, . . . THAT when any person shall be brought before Two or more Justices of the Peace . . . upon a charge of Larceny, and it shall be made to appear to them to their satisfaction that the age of such person does not exceed the age or reputed age of *Fourteen* Years, it shall be lawful for such Justices to hear such charge; and in case they shall be satisfied of the truth of such charge, upon legal and sufficient evidence, or upon confession of the party accused, to convict such Offender, and to commit him or her to the House of Correction, within their control and jurisdiction, there to be imprisoned for any term not exceeding *Six* calendar Months, with or without hard labour at the discretion of said Justices; or it shall be lawful for such Justices either altogether to discharge such Offender without punishment, or to take sureties for his or her good behaviour for any term not exceeding *Six* Months, . . . Provided also, That no conviction shall subject the party convicted to the forfeiture of any goods, chattels, lands, tenements or hereditaments, or shall make the party convicted an incompetent witness: And provided, That nothing herein contained shall hinder or prevent any Justice or Justices from committing any such Offenders for trial at the Assizes, or General Quarter Sessions, or General Sessions of the Peace, . . . if they shall think any such Offender ought to be so committed." ("A Bill to authorize the Summary Conviction of Juvenile Offenders in certain cases of Larceny and Misdemeanor, and to provide Places for holding Petty Sessions of the Peace, as amended by the Committee." British Sessional Papers—House of Commons 1840 (48) II, at pp. 699-700 (5 February 1840).) The original version cited in the text is nearly identical except for the age of juveniles covered by the bill and certain minor changes suggested by the Committee.

oners of trial by jury. The principle of the bill was unconstitutional because it conferred a power upon two magistrates to become judge, jury and executioner at once.' " (Parsloe, *supra*, p. 114.)

In 1847 a more limited juvenile offender bill not only was introduced but actually passed both houses of Parliament. Titled "An Act for the More Speedy Trial and Punishment of Juvenile Offenders" (1847) 10 and 11 Victoria 638, it became law on July 22, 1847.[14] However, for several reasons this act supplies no support for the denial of jury trial to California juveniles charged with felonies.

First, it authorized summary nonjury trials only for what the bill's supporters characterized as "trivial crimes."[15] These were defined as "Simple Larceny, or punishable as Simple Larceny . . . ." This category represented a far narrower range of offenses than contemplated by the rejected 1840 proposal. Sir J. Pakington, chief sponsor of the 1847 legislation, emphasized the 1840 juvenile offender bill had been "a stronger bill—it placed no limit whatever as to the amount of the property stolen, it merely dealt with

---

[14] "'WHEREAS, in order in certain Cases to ensure the more speedy Trial of Juvenile Offenders, and to avoid the Evils of their long Imprisonment previously to Trial, it is expedient to allow of such Offenders being proceeded against in a more summary Manner than is now by Law provided, and to give further Power to bail them' Be it enacted . . . That every Person who shall, subsequently to the passing of this Act, be charged with having committed or having attempted to commit, or with having been an Aider, Abettor, Counsellor, or Procurer in the Commission of any Offence which now is or hereafter shall or may be by Law deemed or declared to be Simple Larceny, or punishable as Simple Larceny, and whose Age at the Period of the Commission or attempted Commission of such Offense shall not in the Opinion of the Justices before whom he or she shall be brought or appear as herein-after mentioned, exceed the Age of Fourteen Years, shall, upon Conviction thereof, upon his own Confession or upon Proof, before any Two or more Justices of the Peace . . . be committed to the Common Gaol or House of Correction within the Jurisdiction of such Justices, there to be imprisoned, with or without hard Labour, for any Term not exceeding Three Calendar Months, . . . Provided always that if such Justices upon the Hearing of any such Case shall deem the Offence not to be proved, or that it is not expedient to inflict any Punishment, they shall dismiss the Party charged, on finding Surety or Sureties for his future good Behaviour, or without such Sureties, . . . Provided also, that if such Justices shall be of opinion, before the Person charged shall have made his or her Defense, that the Charge is from any Circumstance a fit Subject for Prosecution by Indictment, or if the Person charged shall, upon being called upon to answer the Charge, object to the Case being summarily disposed of under the Provisions of this Act, such Justices shall, instead of summarily adjudicating thereupon, deal with the Case in all respects as if this Act had not been passed. . . . [¶] And be it enacted, That every Person who shall have obtained such Certificate of Dismissal as aforesaid, and every Person who shall have been convicted under the Authority of this Act, shall be released from all further or other Proceedings for the same Cause."

[15] Expressing his general approval of this bill, Lord Denman emphasized the minor nature of the crimes involved: "A person who had stolen a fagot or an egg might be imprisoned for some months before his trial . . . . It appeared to be the almost universal opinion of persons most conversant with the subject, that a jury ought not to be required to decide upon offences of such a trifling character; and he (Lord Denman) was therefore prepared, however reluctantly, to consent to a jury being dispensed with in such cases, . . ." (Hansard's Parliamentary Debates, vol. XCIII, Third Series, June 2-July 6, 1847, at p. 700.)

the age of the parties—so that all cases of larceny, where the accused was under the prescribed age, might be dealt with summarily before a magistrate." (Parliamentary Intelligence—House of Commons, The Times, Thursday, April 29, 1847, at p. 3.)

Secondly, the maximum loss of liberty the court could impose was three months. The original 1847 bill would have allowed magistrates to sentence guilty juveniles to six months imprisonment. However, the Select Committee of the House of Lords heard testimony "the Amount of Punishment is excessive for a Magistrate to have the Power of inflicting . . . ." (British Parliamentary Papers (1970) vol. 1, 1847 p. 444.) The committee's recommendation to reduce the maximum loss of liberty to three months was accepted by the House of Commons (Hansard's Parliamentary Debates, *supra,* vol. XCIII, p. 3.)

Finally, the 1847 act met the objection which had evidently doomed the 1840 proposal—the denial of the right to jury trial. The act specifically protected this right by giving the accused juvenile the option of demanding trial through the regular process where he, of course, enjoyed the right to jury trial.[16] "[I]f the Person charged shall, upon being called upon to answer the Charge, object to the Case being summarily disposed of under the Provisions of this Act, such Justices shall, instead of summarily adjudicating thereupon, deal with the Case in all respects as if this Act had not been passed." (An Act for the More Speedy Trial and Punishment of Juvenile Offenders, *supra,* 10 and 11 Victoria at p. 639.)

In contrast to England's limited 1847 Juvenile Offender Act the present California juvenile delinquency process sanctions nonjury trials of any offense. This includes felonies, even those as serious as murder and attempted murder. The California law authorizes a loss of liberty which may amount to five or ten years, or more, where the offense indeed is a felony not a misdemeanor. Furthermore, it does not allow the minor to elect trial by jury in either the juvenile or adult court should he prefer that to summary adjudication.

In 1850, Parliament again considered a bill creating a juvenile justice system akin to the present American system. (A Bill for The Correction and Reformation of Juvenile Offenders and the Prevention of Juvenile Offences.

---

[16]Apparently inclusion of this option was essential to passage of the 1847 legislation. As one member observed during debate : "But although he should vote for the second reading, he could not support the bill in its future stages, unless it should convey in its enactments a direct and specific option to the party accused of an appeal to a jury if he desired it." (Statement of Mr. Bankes, Parliamentary Intelligence—House of Commons, The Times, *supra,* at p. 3.)

British Sessional Papers—House of Commons 1850 III (6 Mar. 1850) p. 465.)[17] This bill applied to juveniles charged with a broader range of

[17]"WHEREAS it is just and expedient to distinguish between Offences against the Laws committed by Children and young Persons, and the like Offences committed by Adults, by applying to Juvenile Offenders Punishment suitable to their Age and Circumstances, and likely to prevent the Adoption by them of lawless and criminal Habits of Life: And whereas the Discipline of Common Gaols and Houses of Correction, and the present Treatment of Juvenile Offenders, are not well adapted, either to diminish the Number of Offences or to reform the Characters of Juvenile Offenders: . . . Be it therefore enacted . . . . That if any Child under *Sixteen* Years of Age be charged before One or more Justices of the Peace or Police Magistrate with any Offence under the Vagrant Laws, or with any Offence which now is or hereafter shall be by Law deemed or declared to be Simple Larceny, or punishable as Simple Larceny, or with any Offence now punishable on summary Conviction, it shall be lawful for the said Justice or Justices or Police Magistrate, upon the due Conviction of such Child, if a Male, to order him to be *once* privately whipped, under the Superintendence of such Constable, Police Officer, or other Person as the said Justice or Justices or Police Magistrate shall appoint, in the most convenient Police Station, Lock-up, or Prison, and to be forthwith discharged, and if such Child be a Female, to reprimand her and order her to be discharged. . . . [¶] That any Justice of the Peace of any County in England or Wales may, . . . give Notice of his Intention to propose at the next Quarter or General Sessions of the Peace for the said County a Resolution to the Effect that there be established for the said County an Industrial School for the Correction and Reformation of Juvenile Offenders; and if such Resolution shall be carried by the Majority of the Justices present at the Discussion of such Resolution at the said next Quarter or General Sessions of the Peace, then the said Justices shall forthwith nominate and appoint a Committee of Justices to procure a proper Site for the said Industrial School, and to superintend the Erection and Completion of the necessary Buildings, at such Costs as may from Time to Time be determined upon by the Majority of the Justices present at any Quarter or General Sessions of the Peace for the said County. . . . [¶] That Provision shall be made in Industrial Schools for the separate Confinement of Children for the Purposes of Correction, for their hard and continuous Labour, for their Instruction in useful Arts, Trades, and Occupations suitable to the working Classes in this Country and in the Colonies, and for their religious and moral Discipline; and for the more effectual Accomplishment of the Objects of the said Institution the Visiting Justices are hereby authorized to purchase or rent sufficient Land, *not exceeding Acres*, for the Purpose of training and practising such Children in agricultural Labour. . . . [¶] That if any Child under *Sixteen* Years of Age shall be charged before One or more Justices of the Peace or Police Magistrate with any Offence under the Vagrant Laws, or with any Offence which now is or hereafter shall be by Law deemed or declared to be Simple Larceny, or punishable as Simple Larceny, or with any Offence now punishable on summary Conviction, having been previously convicted of any such Offence, either under this or any other Act, it shall be lawful for the Justice or Justices or Police Magistrate before whom such Charge is made, upon the due Conviction of such Child for such Second Offence, to sentence him or her to separate Confinement for any Term not exceeding *Ten* Weeks in any One of her Majesty's Gaols . . . . [¶] That it shall be lawful for such Justice or Justices or Police Magistrate, upon the Second Conviction of any Child under *Sixteen* Years of Age for any such Offence, either in addition to or in substitution for such Punishment as is hereinbefore provided, to sentence him or her to be detained, for Purposes of Correction and Reformation, in an Industrial School, for any Term of not less than *One Year* or more than *Three Years*. . . . [¶] *That after the Expiration of Twelve Months from the Admission of any Child into an Industrial School*, if the Conduct of such Child has been satisfactory to the Visiting Justices of the said School, and if it shall be made to appear to the said Visiting Justices that any Parent or Friend of such Child is able and willing to afford him or her proper Protection, Employment and due Separation from any dangerous Companions such Child may formerly have associated with, it shall be lawful for the said Visiting Justices to discharge such Child, and to deliver him or her up to such Parent or Friend. . . . [¶] That after the Expiration of *Two* Years from

minor crimes than the 1847 act. It sanctioned summary trial of the charges without a jury. It also called for the creation of "industrial schools of reform." The proposal empowered courts to commit second offenders to these industrial schools for one to three years in addition to or in lieu of ten weeks in a regular prison. Third offenders could be sent to an industrial school until they reached twenty-one years of age in addition to as much as seven years in prison.

Parliament did not pass this 1850 bill, however. Sir G. Strickland uttered perhaps the most telling objection during debate in the House of Commons. "He was surprised to see the name of [the bill's chief proponent] at the back of a Bill which proposed to abolish trial by jury in two-thirds of all the cases of larceny that were tried in the country. Had the hon. and learned Gentleman read any of the great law writers of the country, who one and all maintained that trial by jury was one of the dearest rights of Englishmen? Had he studied the writings of the law reformers of our own days—the writings of Sir Samuel Romilly, of Lord Brougham, or of a still higher authority—the most learned and constitutional Minister that this country had ever possessed, the noble Lord at the head of the Government who said that to trial by jury the people owed whatever share they possessed in the government of the country; that to trial by jury the Government mainly owed the attachment of the people to the laws—a consideration which ought to

---

the Admission of any Child into an Industrial School of Reform, if such Child shall have no Parent or Friend to whom, under the Provision lastly herein contained, the Visiting Justices can with Safety to such Child deliver him or her up, then it shall be lawful for the Visiting Justices of the said School to provide for such Child in the Manner that may seem to them most suitable for its Welfare in Life, either by keeping him or her in the said Industrial School of Reform, or by employing such Child, if a Male, as a Soldier or a Sailor in Her Majesty's Service, or as a Workman in public Works, or by apprenticing him to any Artificer or Tradesman, either in this Country or in any part of Her Majesty's Dominions, until such Child shall have attained the Age of Twenty-one Years, or, if such Child be a Female, employing her as a Servant or Apprentice in this Country or in any Part of Her Majesty's Dominions, in such Manner, in the Case of a Male or Female Child, as the Visiting Justices shall direct, and as shall be consistent with any General Regulations laid down on the Subject by Her Majesty's Secretary of State for the Home Department. . . . [¶] That if any Child under *Sixteen* Years of Age shall be charged before One or more Justices of the Peace or Police Magistrate with any Offence under the Vagrant Laws, or with any Offence which now is or hereafter shall be by Law deemed or declared to be Simple Larceny, or punishable as Simple Larceny, or with any Offence now punishable on summary Conviction, having been Twice previously convicted of any such Offence, it shall be lawful for the Justice or Justices or Police Magistrate before whom such Charge is made, upon the due Conviction of such Child for such Third Offence, to commit him or her to Prison for any Term not exceeding *Seven* Years, in order to bring him or her within the Operation of the Act passed in the First and Second Years of the Reign of Her present Majesty, intituled 'An Act for Establishing a Prison for young Offenders,' or to sentence such Child to be detained in an Industrial School of Reform until such Child shall attain the Age of *Twenty-one* Years. For any shorter Period, and thereupon such Child may be in any Manner disposed of and employed by Order of the Visiting Justices of such School of Reform, with the Approbation of the Secretary of the Home Department, in such Manner as may be deemed desirable for the public Benefit, until such Child shall attain the Age of *Twenty-one* Years."

make legislators cautious how they took away the right of trial by jury." (3 Hansard's Parliamentary Debates, (Apr. 24, 1850) vol. 110, pp. 779-780.)

Another member was kinder to the supporters of the bill thanking one "for the moral courage he had shown in supporting the Bill, notwithstanding the decided expression of opposition on the part of the house at large." (Statement of Mr. Headlam, Hansard's Parliamentary Debates, *supra*, at p. 781.) However, the bill could not even enlist the vote of the chief spokesman for the successful 1847 Juvenile Offender's Act, Sir John Pakington, who "thought it right to state, as the Juvenile Offenders' Act of 1847 had been frequently referred to in the course of the discussion, that he was no party to this Bill, and that as the measure now stood he could not give it his support." (Statement of Sir J. Pakington, Hansard's Parliamentary Debate, *supra*, at p. 782.) The opposition prevailed and the 1850 bill allowing juveniles to be committed to "industrial schools of reform" for substantial periods of time without the benefit of jury trial did not become law in that year. Consequently, as of the constitutionally relevant year—1850—Parliament had expressly rejected the notion the benefits of reform schools and the like justified denial of jury trial to juvenile offenders.[18]

b. *As of 1850, alleged juvenile offenders were entitled to trial by jury before being declared wards of the court.*

The fate of this proposed juvenile court legislation is powerful evidence of the supreme value English law placed on a minor's right to jury trial as of the critical year of 1850. It seems inconceivable at the same time in English legal history the Court of Chancery could have possessed a power, inherent or otherwise, to decide *without a jury* some youngster had committed a criminal offense and therefore was to be placed in the custody of an institution "in his own interests." If that power existed, Sir John Earley Wilmot and his fellow magistrates would not have found it necessary to propose legislation to create a new court operating without juries to act in a fatherly manner toward minors charged with crimes. They merely would have referred alleged juvenile offenders to the Court of Chancery. Therefore, it is not surprising one searches in vain for any English chancery cases actually claiming to possess the power to act in these cases without a jury.

---

[18]In 1854, Parliament enacted a substantially milder version of the 1850 bill. (Youthful Offenders Act, 17 & 18 Victoria 448 (Aug. 10, 1854).) However, any diminishment in the English juvenile's right to jury trial this act may have entailed came four years too late to affect the California juvenile's constitutional right to trial by jury. Moreover, it should be highlighted even this act only applied to rather minor crimes, primarily in the nature of petty theft. It did not take away the right to jury trial in felonies such as appellant's attempted murder charge.

We first examined all the pre-1850 English cases cited in any American decision[19] as supporting the notion the inherent *parens patriae* jurisdiction of English equity justified a declaration of wardship based on the minor's commission of a felony without trial by jury. Our research only located five such cases.[20] None of these decisions suggests English equity courts had power to shift custody from the parents to another individual or institution for any reason remotely resembling the minor's involvement in criminal activity. Indeed in none was the court's jurisdiction activated by any type of misbehavior on the part of the juvenile. To the contrary, in each case the focus was on the worthiness—and usually the misconduct—of the parent or potential nonparent guardian of the child.

In *Eyre* v. *Shaftsbury (Countess of)* (1722) 2 P. Wms. 103, 24 Eng. Rep. 659, the issue involved the mother's conduct in arranging her son's marriage without the consent of the deceased father's duly appointed guardian. *In ex parte Hopkins* (1732) 24 Ch. D. 1009, a father had allowed his wealthy brother to raise his three daughters. When the brother died he willed substantial sums to the girls who remained in his house under the supervision of a cousin. Seeing an opportunity to lay claim to their legacies the father petitioned chancery to order return of his three daughters. The court held the father was not entitled automatically to custody of his children under these circumstances and it could only make the determination on the basis of a bill. Another cited decision, *Shelley* v. *Westbrooke* (1817) 37 Eng. Rptr. 17 Ch. Bk. 850, denied the poet Shelley custody of his children because of his irreligious and immoral beliefs and behavior. To like effect, the court in *Wellesley* v. *Wellesley, supra,* 2 Bligh N.S. 124, 4 Eng. Rep. 1078 awarded guardianship to the deceased mother's sister because of the father's misbehavior. He was living in adultery and had written letters to his children encouraging them to swear, chase women, and the like. When Wellesley reacted to this defeat by kidnaping his child, it led to the final case cited in the American juvenile court decisions, *Wellesley* v. *The Duke of Beaufort* (1828) 39 Eng. Rptr. 19 Ch. Bk. 538. The real issue here was whether Wellesley as a member of Parliament was subject to contempt.

The present California juvenile delinquency law does not base its declaration of wardship on a finding the parents misbehaved or were unworthy. Instead the California statute predicates wardship on the juvenile's personal

---

[19]See cases listed in footnote 32, *post.*

[20]A post-1850 case also was relied on in some of the American opinions. The *Queen* v. *Gyngall* (1893) 2 Q.B. 232 is of interest only because it discusses the historic *parens patriae* power of equity. The court held a mother could be denied custody of her child even though she had not misbehaved. The reason—the persons with whom the child had been living were deemed worthier guardians and the child said she wanted to remain with them. Thus again it was only a typical civil child custody case.

misbehavior—in this case proof beyond a reasonable doubt the juvenile committed a specific felonious act. Under English law as it existed in 1850, the equity court's jurisdiction to declare a wardship based on misbehavior of the minor was derived solely from a statute enacted in 1840. However, that statute, to be described shortly,[21] preserved the minor's right to trial by jury in that phase of the proceeding which determined whether he indeed had committed the offense which warranted his becoming a ward of the equity courts.

In order to broaden our search for relevant authority, we sent a letter to the parties over a month prior to oral argument which inter alia asked, "As of 1850 was any English court empowered to determine without a jury that a minor had committed a felony and on that basis to declare him a ward of the court and place him in the custody of a reform school or similar institution? . . . Please be prepared to cite to the court and discuss the facts and holdings of any pre-1850 English cases which held the Court of Chancery or any other English court possessed this power?" At oral argument we inquired of the People whether they had been able to find any such cases. The People responded they had searched but had been unable to locate any decision of this nature. Our own research has been equally unsuccessful. This result is not surprising given the actual scope of equity's *parens patriae* jurisdiction as reflected in the pre-1850 English cases described above.

Indeed specifically because equity lacked the power to declare wardship based on a minor's personal misbehavior a bill was introduced in 1840 to confer such authority at least when the misbehavior rose to the level of a felony. Enacted in 1840 during the same session of Parliament which rejected a special nonjury court for juvenile offenders, this law was called "An Act For The Care And Education For Infants Who May Be Convicted Of Felony." (3 & 4 Victoria, (1840) ch. 90, p. 527.)[22] It authorized the

---

[21]See pages 942-944, *post.*

[22]"[I]n every Case in which any Person being under the Age of Twenty-one Years shall hereafter be convicted of Felony, it shall be lawful for Her Majesty's High Court of Chancery, upon the Application of any Person or Persons who may be willing to take charge of such Infant, and to provide for his or her Maintenance and Education, if such Court shall find that the same will be for the Benefit of such Infant, due regard being had to the Age of the Infant, and to the Circumstances, Habits, and Character of the Parents, testamentary or natural Guardian, of such Infant, to assign the Care and Custody of such Infant, during his or her Minority, or any Part thereof, to such Person or Persons, upon such Terms and Conditions, and subject to such Regulations respecting the Maintenance, Education, and Care of such infant, as the said Court of Chancery shall think proper to prescribe and direct; and upon any Order for that Purpose being made, and so long as the same shall remain in force, the same shall be binding and obligatory upon the Father, and upon every testamentary or natural Guardian of such Infant, and no Person or Persons shall be entitled to use or exercise any Power or Control over such Infant which may be inconsistent with such Order of the said Court of Chancery: Provided always, that the said Court may at any Time rescind such Assignment, or from Time to Time rescind, alter, or vary any such Terms or

Courts of Chancery to do some, but not all of the things an American juvenile court is empowered to do.

Under the Infant Felons Act of 1840 the Chancery Court could transfer custody of a child from his or her father to "any Person or Persons who may be willing to take charge of such infant, and to provide for his or her Maintenance and Education if such Court shall find that the same will be for the Benefit of such infant, . . . ." As observed during debate in the House of Commons, "the object of this bill was, to transfer from the hands of parents to the care of a benevolent society, children who [had] been convicted of crime." (55 Parliamentary Debates, Series 3 (June 23—Aug. 11, 1840), p. 1258.) The court also could regulate to some extent how the child was treated while in custody of the benevolent society or other third person and could terminate this guardianship arrangement at any time.

Nowhere in the parliamentary debate over the Infant Felons Act was it even hinted this statute merely codified powers already held by the Court of Chancery or any other English court. The chief spokesman for the bill, Lord Russell, took pains to stress that without this legislation chancery lacked jurisdiction to shift custody of juvenile offenders from their parents to others. "It had been attempted by many benevolent persons to remove such children [who had committed crimes] from the influence of their parents, but *it had been found impossible as the law at present stood.*" (Parliamentary Intelligence—House of Commons, London Times, Aug. 1, 1840, at p. 4, italics added.) Another member of the House of Commons opposed the bill specifically because he "objected to *power being given* to the Lord Chancellor, or any other authority, to deprive parents of the care of their children without their own consent." (Statement of Mr. Estcourt, 55 Parliamentary Debates, *supra,* p. 1259, italics added.) A third member protested "this was *a new principle,* and one of a dangerous and peculiar character." (Statement of Mr. Wakley, London Times, *supra,* Aug. 1, 1840, at p. 4, italics added.) Lord Somerset characterized this "to be the *most extraordinary power* that he had ever known *conferred in any bill* introduced without notice . . . ." (London Times, *supra,* Aug. 1, 1840, at p. 4, italics added.)[23]

Conditions, or such Regulations, as to the said Court may seem fit; and provided also, that the said High Court of Chancery shall and may award such Costs as to it may seem fit, against any such Person or Persons who shall make such Application as aforesaid, if such Application shall not appear to the said Court well founded; and such Costs shall be payable to any Parent or other natural or testamentary Guardian of any such Child who shall oppose such Application. [¶] II. And be it enacted, That in every Case it shall be a Part of the Terms and Conditions upon which such Care and Custody shall be assigned, that the Infant shall not, during the Period of such Care and Custody, be sent beyond the Seas or out of the Jurisdiction of the said Court of Chancery."

[23]This bill was introduced in the House of Commons "without notice" because it had originated in the House of Lords "where it had received very high sanction." (Statement of Lord Russell, London Times, *supra,* Aug. 1, 1840, at p. 4.)

Significantly, however, the Infant Felons Act conferred this "most extraordinary power" on the Court of Chancery only after a juvenile had been *convicted* of an offense after a trial in the law courts during which he had enjoyed a right to jury trial. This provision of the law was highlighted during parliamentary debate, "[B]efore this bill could come into operation, the civil rights of the infant must be *forfeited by a conviction,* and the court might extend that forfeiture to parental control." (55 Parliamentary Debates, *supra,* p. 1258, italics added.) The equity court itself was not empowered to assume jurisdiction over a minor *accused* of an offense or to decide without a jury whether the minor had committed the crime. That jurisdiction remained exclusively with the law courts. As we have seen, in the law courts minors retained the right to trial by jury except when they were only charged with the "trivial offenses" defined in the 1847 Juvenile Offender Act.

Thus as of 1850, Parliament had refused to enact an early form of juvenile court in large part because it denied juveniles charged with felonies of their constitutional right to jury trial. Summary jurisdiction was limited to minor crimes and a maximum three months loss of liberty. And to further dispute any notion the equity courts possessed any *inherent power* to make juvenile offenders wards of the court, Parliament found it necessary to enact a statute to confer this jurisdiction on the Court of Chancery. But in doing so it made Chancery's jurisdiction depend upon a prior conviction in the law courts where the right to jury trial was preserved.

What happened in English legal history after 1850, of course, cannot directly control our determination of the scope of the right to jury trial in present day California. Nonetheless, subsequent developments can shed light on the status of the right to jury trial as of an earlier time. It is instructive to observe when England finally created a separate juvenile court, it did not place this court on the equity side. Nor did this juvenile court purport to derive its authority from the *parens patriae* doctrine or the inherent powers of the Courts of Chancery. Instead the juvenile court was located squarely on the law side. Moreover, and perhaps most revealing, even then the English Parliament deemed it essential to grant juvenile offenders the option of trial by jury in the regular courts should they prefer that to a nonjury trial before the juvenile court.[24]

---

[24]The English Parliament finally created juvenile courts as a separate jurisdiction of the magistrates' courts in the Children Act of 1908. While introducing this legislation in the House of Commons the Lord Advocate conceded "half a century ago, if such a measure had been introduced, it would have been said that the British Constitution was being undermined." (Hansard's Parliamentary Debates (1908 4th Series) at p. 1251, quoted in Parsloe, Juvenile Justice in Britain and the United States,.*supra,* p. 133.) The act gave juvenile courts jurisdiction over all juvenile offenders between ages 7 and 16 except those charged with murder or who committed their offenses jointly with an adult. (Children Act (1908) 8 Edw. 7, ch. 67.) These courts also were given what in the United States would be considered dependency jurisdiction over children under 14 who were in need of care because of the

This act was passed fully 58 years after the House of Lords had failed to create a special jurisdiction for juvenile delinquents on grounds it violated the unwritten constitutional guarantee of a right to jury trial for all Englishmen. By 1908 Parliament was willing to compromise this right somewhat by denying trial by jury in the juvenile court itself. Even then the English legislative body felt England's unwritten constitution required juvenile offenders retain the option to demand their rights to jury trial in the regular courts. Nor was Parliament willing to alter the constitution enough to justify juvenile courts as part of Chancery jurisdiction. Instead as one English commentator observed "the 1908 act decided that juvenile justice should be dispensed by courts and that these courts should be part of the general system of criminal justice. . . . They did not have Chancery jurisdiction, which in Britain had always been restricted to the high court, but they were given by statute responsibility for the welfare of juveniles, as well as for the protection of the community." (Parsloe, Juvenile Justice in Britain and the United States, *supra,* p. 135.)

English commentators have seriously questioned the accuracy of the American belief that English equity's *parens patriae* jurisdiction supports denial of jury trial in this country's juvenile court jurisdiction over alleged delinquents. In a recent comparative study of English and American juvenile court systems, a British scholar concludes:

"The early [American] writers claimed that the [American] juvenile courts acquired the duties and responsibilities of *parens patriae* as part of their equitable jurisdiction.[25] This jurisdiction derived from the English Court of Chancery, and for this reason we have to turn to English history to explore the meaning of this claim. This question is discussed in this chapter . . . because only [American juvenile courts] claim such jurisdiction. . . .

"There were some problems to be resolved before the juvenile courts could claim the prerogative of *parens patriae.* It is unclear whether the

---

conditions in which they were living. (Children Act, *supra,* § 58.)

Under the terms of the Children Act of 1908, magistrates presided over juvenile court and sat without a jury. There was no right to demand jury trial when the court exercised its "civil jurisdiction" over what would be called dependency proceedings in California. However, this was not true of delinquency proceedings.

"When the court was exercising its criminal jurisdiction, either the child or young person or the court could decide that the case should be transferred to a higher court and decided by a judge and jury. Thus the act protected the right to jury trial. . . ." (Parsloe, Juvenile Justice in Britain and the United States, *supra,* p. 134.)

[25]This also was the view adopted by many of the American courts passing on the constitutionality of Juvenile Court Laws which denied the right to jury trial. (See pp. 950-953, *infra.*)

Court of Chancery acquired jurisdiction because a matter concerned a child who needed protection or because a child was the heir to property. . . . There are other factors which suggest the jurisdiction of the two Courts is very different. Chancery courts were never concerned with any kind of criminal behaviour, and their jurisdiction was only invoked by people who had or purported to have a direct familial or legal relationship to the child in question. If the Court of Chancery had power to deal with children referred to it by disinterested well-wishers or law-enforcement agents, this was not a power it used. . . . On the whole it seems likely that early [American] writers like Judge Lindsay, were more concerned with acquiring legal prestige for their juvenile courts than with historical accuracy." (Parsloe, *Juvenile Justice in Britain and the United States, supra,* pp. 60-63.)

In 1927 the English government commissioned a thorough review of the juvenile court and related institutions by the "Departmental Committee on the Treatment of Young Offenders." This committee found the 1840 Infant Felons Act to be the sole example of the use of equity to deal with juvenile delinquents in England prior to 1908. "Guardianship.—The value of individual care and sympathy in the reclamation of an offender, so much insisted on in recent years, was early recognized by reformers, and an interesting attempt to enlist it was made in 1840. In that year an 'Act for the Care and Education of Infants who may be committed for Felony' gave to the High Court of Chancery power to assign the care and custody of such an infant, up to the age of 21, to any person willing to take charge of him. . . . A somewhat similar provision was introduced at a later date in the legislation dealing with cruelty to children, power being given to place the child in the care of a relative or other fit person, but it was *not until 1908 that the principle was again invoked in dealing with offenders against the law.*" (Report of the Departmental Committee on the Treatment of Young Offenders (1938) at p. 10, italics added.)

Modern American scholars likewise have probed this issue in depth. They conclude English equity never had the powers ascribed to it by the American courts seeking to justify the denial of jury trial in wardship proceedings against juveniles accused of crime. One scholar summarizes the findings of an historical inquiry:

"Until recently, juveniles have been excluded from the 'constitutional scheme' partly because *'parens patriae'* was thought to give the state some special power over them. The use of the phrase somehow prevented the balancing we engage in when state and individual interests are in conflict.

"This article examines juvenile law in chancery . . . before and after *'parens patriae'* became a part of it. It shows that *'parens patriae'* became

a helpful synonym for various state interests that the chancellor desired to further: among them, the preservation of juvenile estates; the furtherance of juvenile education; and the protection of juveniles from improper marriages. Hopefully, this paper puts to rest the notion that *'parens patriae'* was or is anything more, so that, when they are in conflict, state and juvenile interests can be balanced as usual." (Cogan, *Juvenile Law, Before and After the Entrance of "Parens Patriae"* (1970) 22 So.Cal.L. Rev. 147.)[26]

Professor Norval Morris said it in stronger terms. "The juvenile court emerged from what was a legal misinterpretation of the *parens patriae* concept. This concept was developed for quite different purposes—property and wardship—and had nothing to do with what juvenile courts do now. Though we keep on prating *parens patriae* to brace it, this assumption of power blended well with the earlier humanitarian traditions in the churches and other charitable organizations regarding child care and childsaving. The juvenile court is thus the product of paternal error and maternal generosity, which is a not unusual genesis of illegitimacy." Morris & Hawkins, The Honest Politician's Guide to Crime Control (1970) p. 157.)

The lesson, of course, is not that American legislatures somehow lack constitutional authority to shift juvenile delinquency proceedings to the equitable jurisdiction of the court. The legitimacy of invoking *parens patriae* to transfer custody of delinquent children from their parents to the state is not at issue in this case. However, the constitutionality of doing so without affording a jury trial during the determination of delinquency is a very different question and is very much before us. In 1850 England when *parens patriae* was invoked for the purpose it has been in the case of Javier A., the right to jury trial attached.

---

[26]Another scholar concludes chancery's *parens patriae* power is not even the true or proper source of the American juvenile court's *dependency* jurisdiction. Instead, he argues this jurisdiction actually grew out of the English poor laws and the authority they gave to remove poor children from the custody of their parents and apprentice them to employers.

"The authorized version of the juvenile courts' history is somewhat as follows. The juvenile court was a successor to chancery. From the earliest times, equity has protected infants who were dependent or neglected under *parens patriae*. . . . The juvenile court was a statutory expression of these impulses. This interpretation contains several errors. First, the courts of equity protected the feudal arrangements and property rather than the 'dependent and neglected;' and there is no evidence that chancery ever protected the dependent and neglected as they were statutorily defined. Second, . . . the juvenile courts' protective jurisdiction was a direct descendant of the poor laws, more particularly those which allowed the state to apprentice a pauper's children without the parents' consent. . . . The power of equity over the estates and sometimes the custody of children, rather than a precedent, was used as a legal argument, after the fact, to make palatable the poor law practice of separating children from their parents." (Rendleman, *Parens Patriae: From Chancery to the Juvenile Court* (1971) So.Cal.L. Rev. 203, 256-257.)

*3. The present California juvenile delinquency law authorizes a court to declare a juvenile to be a ward of the court on the basis of finding he committed a felony, and therefore the California Constitution demands the juvenile be entitled to have that finding made by a jury.*

We are now in a position to summarize the status of the juvenile delinquent's right to jury trial in 1850 England. Youngsters charged with a limited class of minor criminal conduct could be deprived of liberty for a maximum of three months without a jury trial. But those charged with felonious conduct (and most lesser criminal acts) were entitled to trial by jury. Parliament had expressly refused to pass legislation permitting juveniles to be committed to reform schools for periods longer than three months without a jury trial. And where equity's *parens patriae* jurisdiction depended upon a minor's personal misbehavior, those courts could only declare the minor a ward of the court after a jury found he had committed a felony.

Under the present California juvenile delinquency law, the court's power to declare a juvenile a ward of the court is predicated on proof he committed a criminal act.[27] Indeed before a court can make the disposition it did in this case—a wardship of over 15 years—it must have proof beyond a reasonable doubt[28] the juvenile committed the specific act charged[29] and this act must be a felony—not merely a misdemeanor.[30] As we have seen, in 1850 England a juvenile would be entitled to a jury trial in the proceeding which determined whether he actually committed the felonious act. Only then could the court without a jury decide whether it was in the juvenile's best interests to declare him a ward and place him in the custody of some institution or individual other than his parents. Accordingly, since an English juvenile charged with a felony would have been entitled to a jury trial before being declared a ward of the court in 1850, an American juvenile accused of a felony possesses a constitutional right to jury trial before being declared a ward of the court in 1984.

---

[27]"Any person who is under the age of 18 years *when he violates any law* . . . is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." (Welf. & Inst. Code, § 602, italics added.)

[28]"Proof beyond a reasonable doubt . . . must be adduced to support a finding that the minor is a person described by Section 602 . . . ." (Welf. & Inst. Code, § 701.)

[29]*In re Robert G.* (1982) 31 Cal.3d 437, 440 [182 Cal.Rptr. 644, 644 P.2d 837], see page 960, *infra*.

[30]"In any case in which the minor is removed from the physical custody of his parent or guardian as the result of an order of wardship made pursuant to Section 602, . . . the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought . . . the minor under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 726.)

"Except in cases where a different punishment is prescribed by any law of this state, every offense declared to be a misdemeanor is punishable by imprisonment . . . not exceeding six months . . . ." (Pen. Code, § 19.)

As *One 1941 Chevrolet Coupe* made crystal clear, the classification and accompanying right to jury trial was fixed in mid-19th century England. To return to the language of *One 1941 Chevrolet Coupe.* "[T]he Constitution does not permit the Legislature to confer on the courts the power of trying according to the course of chancery any question which has always been triable according to the course of the common law by a jury." (37 Cal.2d at p. 299.) Whether equitable considerations indicated a youthful felon should be declared a ward of the court and placed in the custody of some benevolent organization or an individual other than his parents was a "question [tried] according to the course of chancery" under the authority of the 1840 Infant Felons Act. But whether a given minor was a felon, that is, whether he indeed had committed a crime and for this reason was eligible to be declared a ward, that was a "question which has always been triable according to the course of the common law by a jury." It is this "historical right" which is made "inviolate" by article I, section 16 of the California Constitution. The Legislature cannot extinguish this right merely by shifting the determination of criminal conduct from law to equity. (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283.)

4. *Auto Equity binds this court but we urge the Supreme Court to reconsider and correct the erroneous historical finding by the California Supreme Court 60 years ago that English equity allowed juvenile delinquents to be declared wards of the court without jury trial.*

This completes the search for "historical fact" we are directed to undertake by *One 1941 Chevrolet Coupe* and its progeny. The "historical fact" which emerges is that in 1850 England juveniles could not be incarcerated as felons *nor be declared wards of the court* for their criminal conduct unless and until they had been convicted at a trial where they enjoyed the right to trial by jury. Having found this "historical fact," *One 1941 Chevrolet Coupe* tells us the California Constitution confers that same right on juvenile offenders in this state. Consequently, logic compels the conclusion it is unconstitutional to declare juveniles wards of the court under Welfare and Institutions Code section 602 without first affording them a trial where they enjoy the right to trial by jury.

This conclusion does not end our inquiry, however. Thus far, we have described our historical research as if we were the first California court to discuss the status of the juvenile offender's right to jury trial in 1850 England. As most readers of this opinion are aware, there was one earlier excursion into this territory. Sixty years ago, in *In re Daedler* (1924) 194 Cal. 320 [228 P. 467], the California Supreme Court upheld the Juvenile Court Law of 1915 against an objection it denied alleged juvenile delinquents their constitutional right to jury trial. It did so by expressly finding

English Chancery courts had jurisdiction to declare juvenile offenders wards of the court and therefore California courts could do so also. The implicit but unmentioned assumption in this opinion was that English Chancery courts could declare juvenile offenders wards of the court without affording them a right to jury trial. As we have seen, the *Daedler* court was wrong in accepting this assumption.

*Daedler* was the first Supreme Court opinion to delve into English legal history; it was not the first to consider the constitutionality of denying jury trial to juveniles. Much earlier in our state's history, the California Supreme Court had held a minor could be committed to an industrial school without jury trial. (*Ex Parte Ah Peen* (1876) 51 Cal. 280.) However, this proceeding involved a child "not subject to any parental control whatever—his parents being unknown" and was the antecedent of the present day juvenile *dependency* jurisdiction of the courts. In contrast, when the California Supreme Court first confronted a juvenile *delinquency* proceeding which denied the accused a jury trial, it found this denial violated the California Constitution's guarantee of a right to jury trial.

In *Ex Parte Becknell* (1897) 119 Cal. 496 [51 P. 692], the Court considered an 1893 statute[31] which authorized grand juries to certify an accused under age 18 was "a suitable person to be committed to the care and guardianship of" a juvenile facility, the Whittier State School, rather than to be tried in the criminal courts. This recommendation was then referred to trial judges who held hearings without juries which were the rough equivalent of the jurisdictional hearing phase of the present juvenile process. If, on the basis of the evidence presented, a trial judge agreed with the grand jury's recommendation, it then committed the juvenile to the Whittier State School.

In 1897, the California Supreme Court had no trouble finding this procedure was unconstitutional. Without bothering to cite any prior decisions, the court unanimously held: "As a judgment of imprisonment the order of the superior court is void. The boy cannot be imprisoned as a criminal without a trial by jury. As an award of guardianship it is equally void, for his parents—his natural guardians—cannot be deprived of their right to his

---

[31]Section 13 of the Act of March 23, 1893, related to the Whittier State School Statutes 1893, chapter 222, section 13, page 332 amended section 17 of the original act to read: "If any accusation of the commission of any crime shall be made against any minor, under the age of eighteen years, before any grand jury, and the charge appears to be supported by evidence sufficient to put the accused upon trial, the grand jury may, in their discretion, instead of finding an indictment against the accused, return to the Superior Court that it appears to them that the accused is a suitable person to be committed to the care and guardianship of said institution. The Court may thereupon order such commitment, if satisfied from the evidence that such commitment ought to be made, which examination may be waived by the parent or guardian of such minor."

care, custody, society, and services except by a proceeding to which they are made parties, and in which it is shown that they are unfit or unwilling or unable to perform their parental duties." (119 Cal. at pp. 497-498.)

Thus, in its first encounter with a procedure which committed juvenile delinquents to a juvenile facility without trial by jury, the California Supreme Court held the denial of this right to be unconstitutional. It also expressly found the same end could not be accomplished under the guise of a guardianship proceeding at least in the absence of proof the juvenile's parents were unable to care for the child.

Twenty-seven years later, however, the California Supreme Court apparently experienced a change of heart—or mind. This time it confronted the relatively recent Juvenile Court Act of 1915. In another unanimous decision, *In re Daedler, supra,* 194 Cal. 320, the court upheld the denial of a right to jury trial. In doing so, it treated *Ex Parte Ah Peen, supra,* 51 Cal. 280 as the controlling California authority and expressly overruled *Ex Parte Becknell.* Thus, the *Daedler* court ignored the crucial fact *Ex Parte Ah Peen* involved a dependency proceeding not a delinquency proceeding since it was based upon the juvenile's lack of parents rather than his commission of criminal offenses. *Becknell,* in contrast, was a delinquency proceeding, indeed the only prior California Supreme Court ruling on the right to jury trial for a juvenile offender committed to the care and guardianship of juvenile facilities. Yet the *Daedler* court dismissed *Becknell* as "a brief opinion" which had reached its result "without any citation of authority."[32]

In the 60 years since *In re Daedler,* the California Supreme Court has cited its holding without reconsidering its rationale a total of 8 times.[33]

---

[32]The *Daedler* court cited eight out-of-state decisions on the juvenile right to jury trial issue: *Ex parte Januszewski* (C.C.S.D. Ohio 1911) 196 F. 123; *Mill* v. *Brown* (1907) 31 Utah 473 [88 P. 609]; *Commonwealth* v. *Fisher* (1905) 213 Pa. 48 [62 A. 198]; *Van Walters* v. *Board of Children's Guardians* (1892) 132 Ind. 567 [32 N.E. 568]; *State* v. *Brown* (1892) 50 Minn. 353 [52 N.W. 935]; *Ex parte Crouse* (Pa. 1839) 4 Whart. 9; *Prescott* v. *Ohio* (1869) 19 Ohio 184, 2 Am.Rep. 388; *People* v. *Turner* (1870) 55 Ill. 281 [8 Am.Rep. 645]. Several of these decisions relied on one or more of the English cases discussed at page 941, *ante.*

Two other American cases not mentioned in *Daedler* cite English decisions in upholding the constitutionality of statutes which deny juveniles the right to a trial by jury: *Weber* v. *Doust* (1915) 84 Wash. 330 [146 P. 623], citing *Wellesley* v. *Wellesley, supra,* 2 Bligh (N.S.) 124; *Wissenberg* v. *Bradley* (1929) 209 Iowa 813 [229 N.W. 205], again citing *Wellesley* v. *Wellesley, supra,* 2 Bligh (N.S.) 124.

[33]A brief review of the eight Supreme Court cases which have cited *Daedler* demonstrates the constitutional right to jury trial was never in issue. Thus obviously there was no call to reconsider or reinforce the rationale of that decision. In *People* v. *Hoffman* (1926) 199 Cal. 155 [284 P. 504], the issue before the court was whether a guilty plea in juvenile court can be used for impeachment. The court ruled it cannot. In *In re Edwards* (1930) 208 Cal. 725 [284 P. 916], the issue was whether a juvenile court's declaration of wardship is enough to

Courts of Appeal also have cited *Daedler* many times,[34] again without re-considering its reasoning, although occasionally expressing some reluctance to continue denying jury trial to juvenile delinquents.[35] Accordingly, the denial of jury trial to accused juvenile offenders these past 60 years rests solely on the authority of *In re Daedler* and the rationale of that opinion.

In *In re Daedler,* the Supreme Court found justification for denying trial by jury to California juveniles accused of criminal conduct in the historical wardship powers of the English Court of Chancery, a rationale already discussed and dismissed earlier in this opinion. As expressed by the *Daedler* court: "The theory that the state and its instrumentality, the court, is the guardian of all such minors as require its care and protection is ancient of origin, looking back to the feudal times in England when the Crown, through the *inquisitio post mortem,* had the matter of the supervision over

---

deprive parents of custody without a specific finding of abandonment. The court held it was not. *People* v. *Sanchez* (1942) 21 Cal.2d 466 [132 P.2d 810] involved the question whether the jurisdiction of the juvenile court was exclusive or whether another court could sentence a juvenile to state prison. The court held it was. In *In re Herrera* (1943) 23 Cal.2d 206 [143 P.2d 345], the court considered whether the Youth Correction Authority Act was unconstitutionally discriminatory because a minor could remain in custody longer than an adult convicted of the same offense and ruled it was not. In *People* v. *Dotson* (1956) 46 Cal.2d 891 [299 P.2d 875], the California Supreme Court held due process did not require alleged delinquents to be represented by counsel in juvenile court, a decision which, of course, survived only 11 years until the United States Supreme Court issued *In re Gault.* Another 1956 case, *In re Florance* (1956) 47 Cal.2d 25 [300 P.2d 825], ruled the then existing juvenile court procedure did not violate due process, a conclusion also placed in doubt by *Gault.* In the most recent majority opinion to cite *Daedler, People* v. *Superior Court (Carl W.)* (1975) 15 Cal.3d 271 [124 Cal.Rptr. 47, 539 P.2d 807], the court actually held juvenile court judges are legally empowered to empanel advisory juries in delinquency proceedings.

*In re Daedler* also was cited in one dissenting opinion. *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202] involved the admissibility of a minor's confession. In dissenting from a decision ruling the confession could be admitted, Justice Peters criticized the *parens patriae* doctrine embraced in *Daedler.* "[W]hat started out as a doctrine for the protection of minors, became a straitjacket that made of minors second class citizens deprived of constitutional rights." (67 Cal.2d at p. 398.)

[34]See, e.g., *People* v. *Fifield* (1954) 136 Cal.App.2d 741 [289 P.2d 303]; *In re T.R.S.* (1969) 1 Cal.App.3d 178 [81 Cal.Rptr. 574]; *In re Joe R.* (1970) 12 Cal.App.3d 80 [90 Cal.Rptr. 530]; *In re Clarence B.* (1974) 37 Cal.App.3d 676 [112 Cal.Rptr. 474]; *In re Joseph H.* (1979) 98 Cal.App.3d 627 [159 Cal.Rptr. 681]; *In re Anna S.* (1979) 99 Cal.App.3d 869 [160 Cal.Rptr. 495]; *In re Terry S.* (1981) 121 Cal.App.3d 87 [174 Cal.Rptr. 54]; *In re Chadwick C.* (1982) 137 Cal.App.3d 173 [186 Cal.Rptr. 827].

[35]For instance, in a recent concurring opinion Justice Gardner expressed his disapproval of the continued denial of this and other rights to alleged juvenile offenders: "Long before *Gault* . . . I, as a thoroughly disillusioned judge of the juvenile court, . . . suggested that we divide the juvenile court into two courts. One court would handle dependent children exclusively and would operate on a pure, traditional *parens patriae* juvenile court concept. . . . The other court would handle juvenile law violators and would operate as a criminal court affording the juvenile charged with a crime exactly the same rights as an adult charged with a crime. After the jurisdictional phase of the case, of course, the rehabilitative focus of the juvenile court would still exist." (*In re Harm R.* (1979) 88 Cal.App.3d 438, 446 [152 Cal.Rptr. 167].) See also *In re Frederick G.* (1979) 96 Cal.App.3d 353, 362 [157 Cal.Rptr. 769].

the estates of minors in order to realize the fruits of tenure and of livery to the overlord. This was succeeded by the court of wards and liveries in the time of Henry VIII . . . and which continued to exercise such jurisdiction until the year 1660, when the feudal system having run its course, the jurisdiction of this court was transferred to the court of chancery, through which the king, as we are told, by Blackstone, in his capacity of *parens patriae,* assumed the general protection, not only of infant tenants, but of all infants in his kingdom through the keeper of his conscience, his chancellor. (3 Blackstone, 427, 428.) The development of the English law investing the Crown as *parens patriae* with the supreme guardianship and supervision over infants and the investiture of courts of equity with jurisdiction over the persons and estates of minors is fully set forth in the leading case of *Eyre* v. *Shaftesbury* [1722] 2 P. Wms. 103. The doctrine that the state as *parens patriae* of the people who compose it for the purpose of the care, protection, discipline and reform of those of its citizenship, whether dependents, lunatics, minors, or criminals needing these offices, thus became a part of the British system of government and of jurisprudence, and the jurisdiction of courts of equity over minors thus firmly established in the English law passed to this country upon the establishment of courts of law and equity in its various states, and came regularly into our system of jurisprudence upon the consolidation of these courts." (*In re Daedler, supra,* 194 Cal. at pp. 324-325.)

The *Daedler* opinion does not even mention—and presumably the court did not have before it—any of the historical information discussed in this opinion.[36] *Daedler* does not even touch upon the Infant Felons Act of 1840 which required trial by jury before a juvenile offender could be declared a ward of the court in England. Nor does the opinion mention Parliament's rejection of the juvenile offender bill of 1850 which sought to allow juveniles to be committed to reform school for several years without trial by jury. It does not discuss the 1840 Youthful Offender bill which was defeated or the successful 1847 act which limited the denial of jury trial to youngsters charged with trivial crimes and deprived of liberty for less than three months. Indeed the California Supreme Court in 1924 may not have had available to it the research materials needed to uncover the true historical facts on this issue.[37]

---

[36]We retrieved the Supreme Court's file in *In re Daedler* from the state archives. None of the briefs or other documents in that file cited any of the bills, statutes, parliamentary debates or English court decisions discussed in our opinion. Nor did any of the American decisions which were discussed in those briefs and documents cite any of these materials about English legal history—other than the equity cases already described at pages 933-934, *ante.* As best we can ascertain from the *Daedler* opinion and the case file, the Supreme Court did not have before it nor consider the historical data discussed in our opinion.

[37]The right to jury trial in juvenile proceedings is not the only right to remain inchoate in California because courts have not been called upon—or felt compelled—to explore thor-

Nonetheless, the question remains whether stare decisis binds us, as an inferior court, to this erroneous finding about the juvenile's right to jury trial in 1850 England. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) As the Supreme Court has made abundantly clear: "Under the doctrine of *stare decisis,* all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. . . . The decisions of this court are binding upon and must be followed by all the state courts of California. . . . Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to overrule decisions of a higher court. [Citations omitted.]" (*Auto Equity Sales* v. *Superior Court, supra,* 57 Cal.2d 450, 455.)

Based on *Daedler's* mistaken determination of historical fact, California courts have denied youngsters their constitutional rights to jury trial for 60 years. The defendant in this case likewise was denied this right. Were it within our power, we would reverse the judgment against him and remand the case for trial by jury consistent with the guarantee of article I, section 16 of the California Constitution.

One case implies we may have this power despite the stern command of *Auto Equity.* In *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250], the California Supreme Court confronted a lower court ruling expressly holding stare decisis did not bind it to two previous high court decisions. The trial court refused to follow these decisions for a reason also available in the present case. It found the Supreme Court had based its earlier opinions on an erroneous determination of historic fact—in this instance, the status of Spanish and Mexican water law during the colonial period of California history.

Although its 106-page opinion in *City of Los Angeles* v. *City of San Fernando* was written over a decade after *Auto Equity,* the Supreme Court did not condemn this apparent mutiny. Indeed our high court did not even mention *Auto Equity.* Instead it conducted an extensive independent inquiry into

oughly the English common law as it existed in 1850. For example, the in forma pauperis rights of indigent California litigants also are defined by reference to the in forma pauperis rights of indigent Englishmen in 1850. (*Martin* v. *Superior Court* (1917) 176 Cal. 289 [168 P. 135].) One of those in forma pauperis rights enjoyed by Englishmen in 1850 was the appointment of free counsel for poor people in civil cases. (Statute of Henry VIII, 1495, 11 Hen. 7, ch. 7, 2 Statutes of the Realm 578 (repealed 1883) 46 & 47 Vict. ch. 49) expressly conferring the right to appointment of free counsel, *Martin* v. *Superior Court, supra,* 176 Cal. at pp. 294-295, quoting Blackstone, Commentary on Law (1780), and Marshall, Law of Costs in All Suits and Proceedings in Courts of Common Law; *Olfield* v. *Cobbett* (1845) 41 Eng. Rep. 765; Jones, The Elizabethan Court of Chancery (1967) at pp. 324-328, 501.) Nonetheless the common law right to appointment of free counsel is still not recognized in California because no California court has yet fully examined the English common law on this subject.

the accuracy of the lower court's contrary conclusion as to the content of Spanish and Mexican colonial law. "In past decisions this court has held (1) that plaintiff and its predecessor pueblo had a paramount right, based on Spanish and Mexican law, to use the waters of the Los Angeles River to the extent of its municipal needs and those of its inhabitants [citations omitted] and (2) that the existence of this pueblo water right is a rule of law [citations omitted] and a rule of property [citations omitted] under the doctrine of stare decisis. Ordinarily these circumstances in relation to *a prior holding would lead us to treat it as a closed question not one open to reconsideration. We reconsider our past rulings in this case only because of the extraordinary quantity and complexity of historical and legal data presented* to the trial court *on the question,* the trial court's detailed findings and conclusions to the effect that plaintiff's adjudicated pueblo water right should now be abandoned, and the fact that the injunctive relief requested by plaintiff would have a much more immediate and far reaching effect . . . ." (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d at pp. 245-246, italics added.)

The high court ultimately satisfied itself the earlier Supreme Court interpretations were arguably correct[38] and furthermore that public and private interests had relied heavily on the property law principles announced in those decisions.[39] Only after reaching these two conclusions did the court reverse the trial court and its failure to follow the previous Supreme Court determinations of this "historic fact."[40]

---

[38]"The data on Spanish-Mexican law and history described and referred to in the briefs, while not conclusively demonstrating the existence of the pueblo right, does not conclusively demonstrate its nonexistence but on the contrary provides a reasonable basis for a judicial determination that the right did and still does exist. . . . [¶] There are no serious discrepancies between the legal and historical data now before us on the issue and the data which the parties have drawn to our attention as having been included in the briefs and records in the prior cases in which this court affirmed the existence of the pueblo right." (14 Cal.3d at p. 246.)

[39]"The doctrine of stare decisis applies with special force to rules of property on which those engaged in business transactions have relied in gauging the probable returns on their acquisitions and investments. [Citations omitted.] The pueblo water right has been declared to be such a rule of property. [Citations omitted.] . . ." (14 Cal.3d at pp. 240-241.)

"In building the Los Angeles Aqueduct and importing water from the Owens River, plaintiff relied upon the pueblo right for assurance that all of the imported water would constitute an addition to its water resources rather than replacing any of its less expensive pre-existing supply from the native waters of the Los Angeles River. . . . [¶] All defendants have been on notice of the existence of plaintiff's pueblo water right since they first commenced extracting water from the ULARA. Hence, in contrast to plaintiff's heavy reliance on the existence of the pueblo right there has been no reliance on any supposition of its nonexistence." (*City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d at p. 246..)

[40]*City of Los Angeles* involved judge-made property rules not an individual's constitutional rights. Accordingly, the Supreme Court felt free to take into consideration how much reliance had been placed on the settled existing rule. For this reason, it cannot be said for

We are tempted to draw the lesson from *City of Los Angeles* v. *City of San Fernando* that the Supreme Court allows lower courts to decline to follow its prior decisions in the unique situation where those courts in good faith find the decisions were based on an erroneous finding of "historical fact" about foreign law. This is the rare situation where the high court's legal conclusion is not based on legal judgments and judicial reasoning but on objective factual findings. Thus the validity of the court's decision depends on the accuracy of its facts. Neither the Supreme Court nor the citizens of this state are well served by legal principles predicated on erroneous findings of "historical fact."

Nonetheless, this court places high value on stare decisis and particularly *Auto Equity's* mandate that lower courts defer to the Supreme Court the question of whether and when prior Supreme Court decisions should be overruled. We reluctantly have concluded it would be presumptuous for us to read too much into the restraint our high court demonstrated in *City of Los Angeles* v. *City of San Fernando*. True, it did not condemn the trial court for refusing to follow previous Supreme Court decisions. On the other hand, neither did it expressly excuse this deviation from *Auto Equity*. ▇ Accordingly we conclude we are bound to follow *In re Daedler* unless and until it is overruled by the Supreme Court itself. And we must follow it no matter how erroneous we may feel it to be, indeed no matter how wrong it in fact may turn out to be. We can only urge the Supreme Court in the strongest possible terms to grant a petition for hearing in this case and to reconsider *In re Daedler* and its findings of "historical fact."[41]

B. *Whatever Its Status in 1924, the California Juvenile Justice System No Longer Qualifies as an Equitable Proceeding Which Can Be Constitutionally Conducted Without the Right to Jury Trial.*

Even assuming juvenile offenders could be declared wards of the court without jury trial in 1850 England, that would not justify continued denial of trial by jury in the present California juvenile courts. In purpose, procedure and consequence the juvenile justice system has become something which no longer can be justified as part of the wardship or other equitable jurisdiction of the courts exercised solely in the interests of the juvenile offender. During the 60 years since *Daedler* our juvenile court proceedings

---

certain the court would have modified the "pueblo water right" even were it convinced the trial court was correct and the earlier Supreme Court decisions simply wrong.

The present case, of course, does not allow for this sort of balancing. The courts cannot perpetuate an erroneous denial of constitutional rights merely because someone has come to "rely" on that deprivation.

[41]We are neither so naive nor so overconfident as to assume the Supreme Court will accept our conclusion the *Daedler* court erred without conducting its own independent inquiry into this issue of "historical fact."

have evolved into a process which at English common law could only have been placed under the criminal jurisdiction of the law courts. With the exception of "trivial" offenses carrying a maximum sentence of three months, juveniles in 1850 England were guaranteed the right to jury trial[42] in all cases within the criminal jurisdiction of the law courts. Consequently, California youngsters are entitled to that same right in delinquency proceedings in juvenile courts.

1. *The Daedler court's description of juvenile delinquency proceedings in 1924.*

In 1924, the California Supreme Court was able to distinguish juvenile courts from adult criminal proceedings in glowing terms which spoke of benevolent purposes and minimal consequences. As described by the *Daedler* court: "The purpose of the statute is to save minors under the age of 17 years from prosecution and conviction on charges of misdemeanor and crimes and to relieve them from the consequent stigma attaching thereto; to guard and protect them against themselves and evil-minded persons surrounding them; to protect and train them physically, mentally, and morally. It seeks to benefit not only the child but the community also by surrounding the child with better and more elevating influences and training it in all that counts for good citizenship and usefulness as a member of society. Under it the state which through its appropriate organs is the guardian of the children within its borders . . . assumes custody of the child, imposes wholesome restraint, and performs parental duties . . . . It is of the same nature as statutes which authorize compulsory education of children, the binding of them out during minority, the appointment of guardians and trustees to take charge of the property of those who are incapable of managing their own affairs, the confinement of the insane, and the like." (*In re Daedler, supra,* 194 Cal. at p. 329.)

Quoting from the leading case of *Commonwealth* v. *Fisher* (1905) 213 Pa. 48, (5) Ann.Cas. 92 [62 A. 198], the California court continued by characterizing the procedural aspects of the juvenile court in 1924: " 'There was *no trial for any crime here* and the *act is operative only when there is to be no trial.* The very purpose of the act is to prevent a trial, though if the welfare of the public require that the minor should be tried, power to try it is not taken away; but as already stated the act is not for the trial of a child accused of a crime but is mercifully to save him from such an ordeal with the prison or penitentiary in its wake, if the child's own good and the best interests of the state justify such salvation.' " (*In re Daedler, supra,* 194 Cal. at p. 330, italics added.)

---

[42]See pages 931-940, *ante.*

Now 60 years later we find the Legislature has redefined the purposes of the juvenile process to make them more punitive. Those same 60 years have brought dramatic changes in the procedures followed in juvenile courts causing them to become trials in the full sense of the word—formal, adversarial and public. Finally, the consequences of a finding the accused juvenile committed the charged crime now closely resemble what would follow conviction in adult criminal court.

2. *Purposes of juvenile delinquency law no longer solely those of guardian acting in best interest of the juvenile.*

The differences between the 1924 and 1984 juvenile justice systems are symbolized by the captions affixed to juvenile delinquency proceedings in the two eras. In 1924 it was *"In re Daedler"*; in 1984 it is *"The People of the State of California versus Javier A."* The change in caption is consistent with a change in motive. In 1924 the proceedings focused on protecting the child from unwholesome environmental influences. In 1984 the emphasis is on protecting the citizens of the state of California from the child.

At the time of the *Daedler* opinion and for decades thereafter, the stated purpose of the juvenile court act was to serve "the spiritual, emotional, mental and physical welfare of the minor" and "to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents." (Stats. 1961, ch. 1616, § 2.) But in 1975 the Legislature added a new and second purpose to the generally beneficent language of the original statement in the Juvenile Court Law. This additional goal was placed in a completely separate subsection which reads: "(a) The purpose of this chapter . . ." (the Juvenile Court Law, section 202) also [¶] "(b) . . . includes the *protection of the public from the consequences of criminal activity,* and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter." (Stats. 1975, ch. 819, § 1, italics added.) Not satisfied, in 1977 the Legislature also inserted a new clause in the first paragraph of the section. This further refinement reads: "to *protect the public from criminal conduct* by minors; to impose on the minor a sense of responsibility for his own acts . . . ." (Stats. 1977, ch. 910, § 1, italics added.)

The courts have not been blind to the shifting goals of the juvenile courts. Even before the California Legislature enacted this express language emphasizing protection of the public, the United States Supreme Court had recognized the actual purposes already were similar to those of the adult criminal system. Writing for a unanimous court in a case arising out of a California juvenile delinquency proceeding, Chief Justice Burger held: "Al-

though the juvenile-court system had its genesis in the desire to provide a distinctive procedure and setting to deal with the problems of youth, including those manifested by anti-social conduct, our decisions in recent years have recognized that there is a gap between the originally benign conception of the system and its realities.

"... . . . . . . . . . . . . . . . . . .

"Under our decisions *we can find no persuasive distinction* in that regard *between the proceeding conducted in this case* pursuant to Cal. Welf. & Inst'ns Code sec 701 (1966) *and a criminal prosecution, each of which is designed 'to vindicate [the] very vital interest in enforcement of criminal laws.'* [Citation omitted.]" (*Breed* v. *Jones* (1975) 421 U.S. 519, 528, 531 [44 L.Ed.2d 346, 355, 356, 95 S.Ct. 1779] [holding double jeopardy principles apply in juvenile proceedings just as in adult criminal prosecutions], italics added.)

By 1980, Division Two of this court was acknowledging the continuing evolution of California juvenile courts toward the goals of the adult criminal courts. "In [*County of Alameda* v. *Espinoza* (1966) 243 Cal.App.2d 534 (52 Cal.Rptr. 480)] the court acknowledged the existence, but rejected the validity, of a widely held belief that under current practices juvenile court proceedings involving petitions under Welfare and Institutions Code section 602 are in reality criminal proceedings and the claim that such proceedings are 'for the protection of the minor' is pure fiction. . . . Whatever the validity of that belief in 1966 when the *Espinoza* opinion was filed, it is certainly true today." (*In re Gregory K.* (1980) 106 Cal.App.3d 164, 168, fn. 2 [165 Cal.Rptr. 35].) In 1984, the California Supreme Court while admitting "section 602 proceedings are not technically criminal" cited with approval Division Two's characterization they are "in reality criminal proceedings" and the claim they are for the protection of the minor is "pure fiction." (*In re Jerald C.* (1984) 36 Cal.3d 1, 9, fn. 4 [201 Cal.Rptr. 342, 678 P.2d 917].)

3. *Procedures now nearly as formal, adversarial and public as adult criminal court.*

In 1924, the procedures followed in juvenile court indeed may have been so informal, private and nonadversarial it could fairly be said "there was no trial . . . here" as the *Daedler* court found. However, in the 60 years since *Daedler* each of these attributes has been stripped away until the present process is nearly identical to adult criminal court.

To begin with, the informal, nonthreatening atmosphere so crucial to the rationale for allowing juvenile courts to operate without juries[43] has been replaced by all the formality and technicalities of an adult criminal trial. As recently as 1960, a California commission could report, "Juvenile court hearings are generally conducted in private sessions in an informal manner somewhat along the lines of a case conference. . . . Normally the probation officer, in his role of petitioner, summarizes the allegations of the petition and significant case factors. The court, in turn, may question the child regarding his implication in the delinquent act . . . and may also question the parents regarding child-parent relationships. The judgment is then rendered." (Governor's Special Study Commission on Juvenile Justice, A Study of the Administration of Juvenile Justice in California, part II (1960) p. 7.) If this indeed was an accurate description of juvenile court proceedings in 1960, the intervening 24 years have changed all that.

Juvenile proceedings now feature the same contests over admission of evidence as adult proceedings since only proof admissible in a criminal trial can be used to support a finding the juvenile committed the criminal offense. (Welf. & Inst. Code, § 701.) Illegally obtained evidence is inadmissible just as in an adult prosecution. (Welf. & Inst. Code, § 700.1.) Motions to suppress ordinarily are heard in separate pretrial hearings similar to 1538.5 proceedings in adult court. (Welf. & Inst. Code, § 700.1.) The crime proved against the juvenile must be the specific one alleged in the charging petition or be a lesser included offense of the crime which was specifically alleged. (*In re Robert G., supra,* 31 Cal.3d 437, 440.) Commission of that crime must be established beyond a reasonable doubt just as in an adult criminal trial. (Welf. & Inst. Code, § 701; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068].) The same rules of joinder, consolidation and severance of charges apply in juvenile delinquency proceedings as in adult criminal cases. (Welf. & Inst. Code, § 675, subd. (b).) So do the rules for pretrial discovery of the People's evidence supporting those charges. (*Joe Z. v. Superior Court* (1970) 3 Cal.3d 797 [91 Cal.Rptr. 594, 478 P.2d 26].) A juvenile court judge cannot accept a juvenile's admission he committed the crime unless he or she first fully admonishes the accused about his legal rights. (*In re Michael M.* (1970) 11 Cal.App.3d 741 [96 Cal.Rptr. 887].) Moreover, the court must notify the juvenile of his right to appeal. (*In re Arthur N.* (1974) 36 Cal.App.3d 935 [112 Cal.Rptr. 89].)

---

[43]"Since juvenile offenders were considered helpless children in need of care and attention, it was important that the courtroom, the officers of the court, the routine methods of operation, and the ultimate goals of the juvenile court should in no way resemble police courts or the traditional criminal courts. An ideal juvenile court should be more like a parlor or study than an official courtroom. . . . [T]he atmosphere of the courtroom should be relaxed and informal so as to encourage trust and cooperation on the part of the offender." (Platt, The Child Savers (1977) pp. 144-145.)

As if to belie the underlying justification the court is only deciding what is in the best interests of the juvenile, the same notions of "criminal responsibility" apply as in adult court.

A "true finding" of delinquency can be made only if the juvenile is sane. (Welf. & Inst. Code, § 702.3; *In re M.G.S.* (1968) 267 Cal.App.2d 329 [72 Cal.Rptr. 808].) (Ironically, although elsewhere the juvenile court legislation assiduously avoids any suggestion a juvenile delinquent is being found guilty of a crime, section 702.3 specifically allows the juvenile to plead *not guilty* by reason of insanity.)

Meanwhile the adversarial nature of the proceedings has been both recognized and guaranteed by extension of the rights to confront and cross-examine witnesses (Welf. & Inst. Code, § 630; *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]) and the right to appointed counsel (Welf. & Inst. Code, § 679; *In re Gault, supra*). Probation officers devoted to the best interests of the child formerly presented the case to the court. Now a "prosecuting attorney [must] appear *on behalf of the People* of the State of California." (Welf. & Inst. Code, § 681, italics added.) The code itself concedes the aspiration to conduct these proceedings in an "informal nonadversary atmosphere" no longer applies where there are contested issues of law or fact. (Welf. & Inst. Code, § 680.) As the Supreme Court pointed out in *People* v. *Superior Court (Carl W.)* (1975) 15 Cal.3d 271, 277-278 [124 Cal.Rptr. 47, 539 P.2d 807]: "It is notable, . . . that in adopting section 680 the Legislature . . . made a change in the bill proposed by the Commission which must be considered significant: it added to the second sentence of the bill the introductory clause . . . '[e]xcept where there is a contested issue of fact or law.' . . . Thus, whereas the second sentence as proposed by the Commission provided in effect that *in all cases* the proceedings should be conducted in an informal nonadversary atmosphere, the Legislature, by adding the language in question, clearly indicated that more formality should be observed when there was a contested factual or legal issue."

With all these changes in procedure over the past decades, it is not surprising to find one author reporting: "Many [California juvenile court] judges conduct contested jurisdictional hearings just like any other criminal . . . trial." Thompson, Cal. Juvenile Court Deskbook (1972) section 6.6, quoted in *People* v. *Superior Court (Carl W.), supra,* 15 Cal.3d 271, 278, fn. 6.)

Finally, the United States Supreme Court and the California Legislature have stripped away the cloak of privacy in the past five years. As recently as 1975, the California Supreme Court was noting some juvenile court judges feared "jury trials would attract much publicity and do much to

eliminate the *confidentiality* which is *necessary for effective juvenile court proceedings.*" (*People* v. *Superior Court (Carl W.), supra,* 15 Cal.3d 271, 276, fn. 3, italics added.) But in 1979 the United States Supreme Court held states cannot prohibit newspapers from publishing the names of juveniles charged in juvenile court. (*Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667].) Then in 1980 the Legislature amended Welfare and Institutions Code section 676[44] to allow both the public and the press to be "admitted, on the same basis as they may be admitted to trials in a court of criminal jurisdiction" where the juvenile is charged with commission of any one of a long list of serious offenses. This list includes attempted murder, (Welf. & Inst. Code, § 676, subd. (a)(11)) with which Javier A., the juvenile in the instant case, is charged. So much for the necessity of confidentiality to effective juvenile court proceedings.

4. *In the years since 1924 the consequences of "true findings" in juvenile delinquency proceedings have come to resemble those resulting from criminal convictions.*

Once it is found a juvenile has indeed committed a criminal offense, he is not in much better shape than an adult criminal defendant. Instead of being taken away from his family only if necessary for his own best interests, under current standards a juvenile will be incarcerated in a juvenile facility for the same reason as an adult—if it will protect the public. (Welf. & Inst. Code, § 202, subd. (b).) Moreover, the length of his incarceration will be influenced not merely by the juvenile's own best interests but, similar to an adult, by the nature of the offense he committed. The court must expressly announce whether the charged crime is a felony or a misdemeanor. (*In re Kenneth H.* (1983) 33 Cal.3d 616 [189 Cal.Rptr. 867, 659 P.2d 1156].) If only a misdemeanor, the juvenile offender may not be physically confined more than one year. But if it is a felony he may be confined as long as the *aggravated* term an adult could have received for the same offense. (Welf. & Inst. Code, §§ 726, 731.)

---

[44]Section 676, subdivision (a) provides: "(a) Unless requested by the minor concerning whom the petition has been filed and any parent or guardian present, the public shall not be admitted to a juvenile court hearing. The judge or referee may nevertheless admit such persons as he deems to have a direct and legitimate interest in the particular case or the work of the court. However, except as provided in subdivision (b), members of the *public shall be admitted,* on the same basis as they may be admitted to trials in a court of criminal jurisdiction, *to hearings concerning petitions filed pursuant to Section* 602 alleging that a minor is a person described in Section 602 by reason of the violation of any one of the following offenses:
 "(1) Murder.
 " . . . . . . . . . . . . . . . . . . .
 "(11) Assault with intent to murder or *attempted murder.*
 "(12) Assault with a firearm or destructive device.
 "(13) Assault by any means of force likely to produce great bodily injury." (Italics added.)

The courts also have come to realize the place of confinement does not make that much difference. Incarceration in a juvenile facility is about the same as incarceration in an adult prison. As the United States Supreme Court held in *Breed* v. *Jones, supra,* 421 U.S. 519: "We believe it is simply too late in the day to conclude . . . that a juvenile is not put in jeopardy at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years. . . . In *In re Gault* . . . this Court concluded that . . . a 'proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.' . . . The Court stated that the term 'delinquent' had 'come to involve only slightly less stigma than the term "criminal" applied to adults,' . . . and that. . . . 'commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." ' "

" . . . . . . . . . . . . . . . . . . . . . . .

"Nor does the fact 'that the purpose of the commitment is rehabilitative and not punitive . . . change its nature. . . . Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken. Incarceration of adults is also intended to produce rehabilitation.' *Fain* v. *Duff,* 488 F.2d at 225." (*Breed* v. *Jones, supra,* 421 U.S. at pp. 529-530, fn. 12 [44 L.Ed.2d at pp. 355-356].)[45]

5. *In 1984 the juvenile court process no longer is a guardianship proceeding properly cognizable in equity but has the attributes of a criminal trial requiring a right to trial by jury.*

Adding all these changes together, we cannot escape the conclusion the juvenile court of 1984 bears little resemblance to the benevolent 1924 version described in *In re Daedler.* During the succeeding 60 years the purposes of the juvenile process have become more punitive, its procedures formalistic, adversarial and public, and the consequences of conviction

---

[45]Anecdotal evidence suggests the conditions of confinement may be worse for some juvenile delinquents than for adult prisoners. For a recent description of California's juvenile facilities, see "Inside the State's Juvenile Jails: Unruly Youths Face Shackles, Isolation," Los Angeles Times, Sunday, July 22, 1984, part I, pages 1-3, 28-29. For the most part this article deals with juvenile halls, camps and the like, not delinquents who are detained in adult jails. See also, Murphy, Our Kindly Parents—The State: The Juvenile Justice System and How It Works (1974) pages 46-101, discussing similar conditions at the Illinois Industrial School for Boys. Illinois also denies delinquents the right to jury trial on grounds juvenile courts are merely conducting wardship proceedings.

much more harsh. Accordingly, even if we were to concede *In re Daedler* applied the appropriate test for the right to jury trial to the juvenile court process of 1924, the character of that process has changed so much in the intervening 60 years we are convinced the *Daedler* court would be compelled to a different conclusion.[46]

---

[46]Proposition 8 has introduced a possible third independent and sufficient grounds for ruling juveniles are now constitutionally entitled to trial by jury in delinquency proceedings. Since June 9, 1982, Proposition 8 incorporated the following language in article I, section 28, subdivision (f) of the California Constitution: "Any prior felony conviction of any person in any *criminal proceeding,* whether adult *or juvenile,* shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence . . . ." (Italics added.)

It has not yet been finally resolved whether this new constitutional provision officially defines juvenile court proceedings as "criminal proceedings" and allows true findings in juvenile court to be used as "criminal convictions" for purposes of impeachment and enhancement. Recently two Courts of Appeal held it does not. (*People* v. *West* (1984) 154 Cal.App.3d 100 [201 Cal.Rptr. 63]; *In re Anthony R.* (1984) 154 Cal.App.3d 772 [201 Cal.Rptr. 299].) Instead these courts interpreted this language to apply only to convictions of juveniles in adult criminal court after they have been found unfit for treatment in juvenile court. This construction, however, conflicts with dictum in a Supreme Court opinion. In *In re Kenneth H.,* the Supreme Court held a *juvenile court* must specify whether it finds the juvenile delinquent committed a felony or misdemeanor. In highlighting some of the consequences of this distinction in juvenile proceedings, Justice Kaus observed, "[T]he potential for prejudice from a finding of felony status has been increased by passage of *Proposition 8, which provides that any prior felony conviction, whether adult or juvenile, 'shall . . . be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding.'*" (33 Cal.3d at p. 619, fn. 3, italics added.)

Since we already have identified two other persuasive grounds supporting a constitutional right to jury trial for juvenile delinquents, we will not attempt to resolve this apparent conflict between Supreme Court dictum and Court of Appeal holdings. But we do think it worthwhile to note that should the *Kenneth H.* interpretation prevail, both the federal and California Constitutions will require that juveniles be afforded the right to jury trial in delinquency proceedings.

The Proposition 8 language is the only reference to juvenile courts in the entire California Constitution. If it is construed to define delinquency cases as "criminal proceedings" resulting in "criminal convictions," this characterization would control over the statutes which speak in terms of merely "adjudging a minor to be a ward of the juvenile court." (Welf. & Inst. Code, § 602.) In 1850 England, minors clearly were entitled to trial by jury in all "criminal proceedings." And in 1984 California, no one—including juveniles—may be subjected to "criminal proceedings" or risk "criminal conviction" without having the chance to demand trial by jury. (Cf. *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760 [150 Cal.Rptr. 785, 587 P.2d 227] [right to jury trial attaches in simple marijuana possession prosecutions even though only fine and no loss of liberty could be imposed, because Legislature nevertheless characterized these violations as "misdemeanors"].)

Furthermore, as criminal proceedings, California juvenile delinquency cases would be controlled by Supreme Court decisions which guarantee the right to jury trial under the Sixth Amendment in any criminal proceeding where the accused can receive a sentence longer than six months. (*Duncan* v. *Louisiana, supra,* 391 U.S. 145.) The only reason the United States Supreme Court tolerated denial of jury trial in Pennsylvania's juvenile courts was because they were not deemed to be "criminal proceedings" which could result in "criminal convictions." (*McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528, 540, 551 [29 L.Ed.2d 647, 658, 664, 91 S.Ct. 1976].)

The inevitability of this conclusion was recognized by the California District Attorneys' Association. In a handbook interpreting Proposition 8 prepared by that association and the Center for Criminal Justice Policy and Management, it is observed: "If the language 'wheth-

Whatever might be said about the juvenile court of 1924, the essence of the 1984 version is criminal. This reality cannot be diminished by the fact juvenile delinquency proceedings retain the label of an equitable action—declaration of wardship—despite revolutionary changes in philosophy, procedure and consequence. As the Supreme Court has explained: "In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law." (*People* v. *One 1941 Chevrolet Coupe, supra,* 37 Cal.2d 283, 299.) "On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial." (Citations omitted.) (*C & K Engineering Contractors* v. *Amber Steel Co., supra,* 23 Cal.3d 1, 9 [151 Cal.Rptr. 323, 587 P.2d 1136].)

This "gist of the action" test requires the courts to peer through the smoke screen of statutory labels and uncover the true substance of a given type of case. One frequently used approach is to describe what the case really involves in plain English and ask whether something of that nature would have been heard in the law courts or in equity under the common law. "Stripped of legal conclusions and reduced to ultimate facts" (*Tibbitts* v. *Fife* (1958) 162 Cal.App.2d 568, 572 [328 P.2d 212]), a juvenile delinquency proceeding in 1984 asks a court to decide whether a child has violated a specified criminal law and whether this violation is a felony or misdemeanor. If the court decides beyond a reasonable doubt the child did commit the crime, it can, in order to "protect the public from criminal conduct," deprive the child of his liberty for the same period of time an adult would lose his liberty for violating the same criminal law.

In 1850 England the "gist of the action" just described was "in reality cognizable at law." Indeed in 1850 England a legal proceeding to take away a child's freedom on the basis of his commission of a crime would have been a "criminal proceeding always heard in the law courts and never in equity."[47] The "rights involved" are the child's right to personal liberty on the one hand and the public's right to be protected from criminal conduct

---

er adult or juvenile' is intended to modify 'criminal proceeding,' as it appears in section 28 (f), it must be concluded that the intent of the amendment was to redefine the terms 'conviction' and 'criminal proceeding' to include 'true finding' and 'hearing' . . . and that the attending *rights of* a public trial and *jury* would be extended to juvenile 'defendants'." (Criminal Justice Policy and Management, University of San Diego School of Law, Prop. 8—the Victim's Bill of Rights (1982) p. VII-9., italics added.)

[47]"[T]he general rule at common law proper was that accusations of all crimes involving loss of liberty as a punishment were triable by a jury; . . ." (*Ex Parte Wong You Ting* (1895) 106 Cal. 296, 299 [39 P. 627].)

on the other. These are the type of rights implicated in criminal law not equity. Moreover, the "facts of the particular case" are whether the child committed certain specified criminal acts.[48] These are the same kinds of facts juries are asked to determine in adult criminal proceedings. "'Accusations of criminal conduct are tried, at the common law, by jury; . . . .'" (*People* v. *Powell* (1891) 87 Cal. 348, 357 [25 P. 481], quoting Cooley on Constitutional Limitations (5th ed.) p. 390.) The determination whether the child committed the crime does not "depend upon the application of equitable doctrines." It is an issue of fact in a juvenile delinquency case as much as it is in an adult criminal case. If a jury is capable of deciding an adult committed a crime it is equally capable of deciding a juvenile committed a crime.

The fact juvenile courts as such were unknown to the common law[49] does not affect the child's right to jury trial where the "gist of the action" is criminal. "It has been held, it is true, that the Constitution does not secure the right [to jury trial] in special proceedings. . . . This does not mean, however, that the legislature may at will create new forms of special procedure, parcel out among them the subject-matter of the ordinary actions at law heretofore triable by jury and thereby whittle away the right to a jury trial. [Citations omitted.]" (*Cassell* v. *Gregori* (1937) 28 Cal.App.2d Supp. 769, 774 [70 P.2d 721].) Nor can the Legislature create a new special procedure where jury trial is inappropriate and then over the years transform it into a criminal proceeding without reactivating the right to trial by jury. No matter when the whittling starts the effect is the same—Californians are denied jury trials in cases where they would have been available in 1850 England. This is precisely what article I, section 16 was designed to prevent.

6. *Auto Equity binds this court to Daedler but we urge the Supreme Court to consider, assuming Daedler correctly characterized juvenile delinquency proceedings as wardship actions properly cognizable in equity in 1924, whether that characterization is accurate in 1984 or whether those proceedings in reality have become criminal prosecutions properly cognizable in law where there exists a constitutional right to trial by jury.*

This court has concluded juvenile delinquency cases in 1984, no matter how labelled, are criminal prosecutions. Minors have always enjoyed a right

---

[48]Significantly, when the California Court of Appeal first held jury trial was unnecessary in insanity cases it emphasized that sort of proceedings "does *not involve an inquiry as to whether a crime had been committed,* . . ." (*Matter of Application of O'Connor* (1915) 29 Cal.App. 225, 233 [155 P. 115], italics added.)

[49]Proposals to create separate juvenile courts, reform school and the other components of the present juvenile justice system were considered in pre-1850 England. These proposals, however, were rejected because they also sought to take away the juvenile's right to trial by jury. (See pp. 933-940, *ante.*)

to trial by jury in criminal prosecutions both in pre-1850 England and in California. Under *One 1941 Chevrolet Coupe* it follows California can no longer deny this right in juvenile delinquency cases. Consequently, were it in our power we would reverse the judgment against the defendant in this case for this second and independent ground. Once again, however, we are bound under *Auto Equity* to the Supreme Court's last authoritative decision on the constitutionality of denying jury trial in juvenile delinquency cases, *In re Daedler.* And thus, once again we can only urge the Supreme Court to reconsider this 60-year-old opinion. This time we ask the court to reexamine the *Daedler* rationale not because of what it overlooked in the English legal system of 1850 but what it could not have foreseen about the shape of the California juvenile justice system of 1984.

If we are correct in our conclusion the California juvenile court system has now evolved into a specie of "criminal prosecution," the right to jury trial would be guaranteed not only by article I, section 16 of the California Constitution but by Amendments Six and Fourteen of the United States Constitution as well. "The right to an impartial jury '[i]n *all criminal prosecutions*' under federal law is guaranteed by the Sixth Amendment. Through the Fourteenth Amendment that requirement has now been imposed upon the States. . . ." (*McKeiver* v. *Pennsylvania, supra,* 403 U.S. 528, 540 [29 L.Ed.2d 647, 658]; *Duncan* v. *Louisiana, supra,* 391 U.S. 145; *Bloom* v. *Illinois* (1968) 391 U.S. 194 [20 L.Ed.2d 522, 88 S.Ct. 1477], italics added.)

Nearly seven years ago California's Chief Justice observed "[t]he time is drawing inevitably closer when this court must confront, in light of the developing changes in the functions of the juvenile court system, whether the immunity of that system from all of the protections of the criminal courts can withstand constitutional scrutiny." (*In re Mitchell P.* (1978) 22 Cal.3d 946, 962, fn. 14 [151 Cal.Rptr. 330, 587 P. 1144] (dis. opn. of Bird, C. J.) We humbly submit that what was drawing inevitably closer in 1978 has now arrived. The issue of right to jury trial in juvenile delinquency proceedings is not just ripe for Supreme Court reconsideration, it is overripe.[50]

---

[50]Two other states recently have held there is a constitutional right to a jury trial in juvenile delinquency cases, recognizing that juvenile delinquency proceedings are the equivalent of criminal prosecutions: *Peyton* v. *Nord* (1968) 78 N.M. 717 [437 P.2d 716] and *RLR* v. *State* (Alaska 1971) 487 P.2d 27.

The language of *RLR* v. *State* is especially instructive. The Alaska Supreme Court noted the "purposes of the right to jury trial, discussed in *Duncan* [v. *Louisiana, supra,* 391 U.S. 145, 156 (20 L.Ed.2d 491, 499-500)] such as protection 'against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge' apply as much in children's cases as in adults' cases." (*Id.* at p. 32.) The court concluded that "treating the adjudicative phase of a delinquency proceeding for sale of LSD differently from an ordinary adult criminal prosecution for purposes of the right to jury trial would be a cynical and unprincipled refusal to obey the Alaska Constitution," and held that "whenever a child in a delinquency

C. *Policy Considerations Do Not Justify Denial of the Right to Trial by Jury in Juvenile Delinquency Proceedings.*

Much of the People's brief and oral argument was devoted to policy arguments. Purportedly, recognition of a constitutional right to jury trial in juvenile delinquency cases would cause major disruptions in the juvenile justice system. Courtrooms are not equipped with jury boxes. Jury trials take up too much time. Lengthy delays are inevitable. In essence the People argue it might be impossible to operate a separate juvenile court system if the accused were offered the opportunity to elect trial by jury.

This court is not persuaded by these arguments. They tend to understate, indeed ignore, the positive values promoted by the right to jury trial. They also may overstate the costs of this right. And, in any event, these policy considerations cannot dictate the fate of the right to jury trial. Fundamental constitutional rights must be enforced whatever the administrative inconvenience or financial cost.

1. *The benefits of a right to jury trial.*

We already have had occasion to mention the reverence accorded trial by jury in common law England. (See pages 931-932, 935-936, 939-940, *ante.*) The United States Supreme Court has been almost as enthusiastic in proclaiming the values served by this right. "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government . . . . Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. . . . [T]he most recent and exhaustive study of the jury in criminal cases concluded that juries do understand the evidence and come to sound conclusions in most of the cases presented to them and that when juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created." (*Duncan* v. *Louisiana, supra,* 391 U.S. 145, 155-157 [20 L.Ed.2d 497, 499-501].)

---

proceeding is charged with acts which would be a crime, subject to incarceration if committed by an adult, the Alaska Constitution guarantees him the right to jury trial." (*Id.* at p. 33.)

This passage identifies several divisible benefits of the jury system. First, it protects against the weak judge who might bow to pressures from others in government. Second, it protects against the biased judge who because of personal predilections cannot be counted on for a fair decision.[51] Third, it allows the injection of community values into the decision-making process when the accused deems this preferable to even a strong and impartial judge. A fourth benefit, not mentioned directly in *Duncan,* flows from the mere presence of juries in a given type of case. Jury service helps keep the community involved in and knowledgeable about what is happening in those proceedings.

These benefits appear to have as much meaning for juvenile delinquency proceedings as for adult criminal court. We have been given no reason to believe the juvenile court bench is immune from the assignment of weak or biased judges. Indeed some juvenile judges may be subject to a subtle form of bias seldom found in adult court—the bias of good intentions.

Nor do we find the common citizen's perspective less valuable when deciding whether a juvenile committed a crime than when deciding whether an adult committed a crime. In either instance, jurors provide a fresh look at the witnesses, the other evidence, the prosecutor and the crime. This fresh look is especially critical when proceedings feature repetitive fact patterns and professional witnesses, features at least as common in juvenile as in adult cases. A jury also offers a wider range of human experiences and values than could a single judge, no matter how well-educated or well-intentioned. These experiences and values can be at least as helpful in evaluating the alleged criminal behavior of a young person as an adult.

Finally, opening the workings of the juvenile justice system to frequent scrutiny by juries may lead to a more knowledgeable electorate. Courts, social scientists, and commentators have all railed on about the deficiencies and disappointments of the juvenile court movement. (See, e.g., *In re Gault, supra,* 387 U.S. 1; *Breed* v. *Jones, supra,* 421 U.S. 519; and even *McKeiver* v. *Pennsylvania, supra,* 403 U.S. 528, and the sources cited therein.) Yet meaningful reform and adequate resources will not come without public support. Meantime we have closed the general public's main window into these courts—serving on a jury personally or hearing from someone who has.

The benefits of a right to jury trial in juvenile delinquency cases does not depend upon the right being exercised in every trial—or even in a substantial

---

[51]One might also add to this list protection against the overburdened, harried judge and the tedium of routine often repetitious fact patterns. What long ago may have become old hat to an experienced judge will be novel and intriguing to a newly empaneled jury. Thus a jury may well look closer at the evidence.

percentage. The experience of other jurisdictions suggests it will be used sparingly.[52] Still the mere existence of this right can have a healthy effect on juvenile courts far beyond those few cases in which the right is exercised. As one commentator observed: "[T]he bare threat of a jury trial is generally sufficient to keep the judges independent and honest, for they know that the slightest suspicion of prejudice by either side will bring an end to jury waivers in their court. Its absence, as the realities of the juvenile justice system so starkly demonstrate, has the effect of causing the judicial process to degenerate into a kind of sick comedy.

"What juries do, therefore, is to provide insurance of the accuracy and impartiality of fact finding for which neither appellate review nor self-serving judicial declarations of impartiality can substitute." (Smith, *Jury Trials, The Juvenile Court, And The California Constitution: From Specious Acorns Grow Trees of Injustice* (1975) 50 L. A. Bar Bull. 142, 150).) Or in the less emotional words of the United States Supreme Court: " 'Even where defendants are satisfied with bench trials, the right to a jury trial very likely serves its intended purpose of making judicial or prosecutorial unfairness less likely.' " (*Duncan v. Louisiana, supra,* 391 U.S. 145, 158 [20 L.Ed.2d 491, 501].

### 2. *The costs of the right to jury trial in perspective.*

As to the contentions about cost and inconvenience we note evidence exists suggesting the right to jury trial may not be nearly so disruptive of the juvenile justice system as some anticipate.[53] At least 13 states already allow alleged delinquents the right to jury trial in juvenile court, either by statute or constitutional interpretation.[54] Several of these jurisdictions have

---

[52]See pages 971-973, *post.*

[53]Should the California Supreme Court recognize the constitutional right to jury trial in juvenile court it would not necessarily have to impose the additional cost of retrying delinquents whose cases already had been decided without juries. In *DeStefano v. Woods* (1968) 392 U.S. 631 [20 L.Ed.2d 1308, 88 S.Ct. 2093], the United States Supreme Court refused to give retroactive application to its own decision announcing a right to jury trial in state criminal proceedings. (*Duncan v. Louisiana, supra,* 391 U.S. 145.)

[54]There are currently at least 13 states in which juvenile jury trials are statutorily authorized in some form: Alaska Stat. (supp. 1983) § 47.10.070; Colo. Rev. Stat. (1983 cum. supp.) § 19-1-106(1)(a); Kan. Stat. Ann. (1981) § 38-808; Mass. Ann. Laws, ch. 119, (Cum. supp. 1984) § 55A Michie/Law; Mich. Comp. Laws (supp. 1984) § 598.17; Mich. Stat. Ann. (Callaghan supp. 1984) § 27.3178; Mont. Code Ann. (1984) § 41-5-521; N.M. Stat. Ann. (1981) § 32-1-31A; Okla. Stat. Ann., tit. 10 (West, supp. 1983) § 1110; S.D. Codified Laws Ann. (1976) § 26-8-31; Tex. Fam. Code Ann. (Vernon supp. 1983) § 54.03(c); W. Va. Code (1980) § 49-5-6; Wis. Stat. Ann. (West 1979) § 48.243(g); and Wyo. Stat. (1977) § 14-6-224(a). In most of these states it is a matter of statutory law. But the Supreme Courts of two—Alaska and New Mexico—have declared the right to jury trial to be constitutionally protected. (*RLR v. State, supra,* 487 P.2d 27; *Peyton v. Nord, supra,* 437 P.2d 716.) Four of these states—Colorado, Massachusetts, Michigan and Oklahoma—provided for six person juries in juvenile court.

done so for decades.[55] Moreover, these states continue to operate different dispositional programs for juveniles than for adults.[56] If convicted by a jury, a youngster is screened for appropriate treatment in the same way a California juvenile would be after a judge found he had committed a crime. And if he is to be physically confined, it will be in a special juvenile facility not an adult prison. Thus jury trials do not appear inherently incompatible with a separate juvenile justice system.[57]

Two empirical studies—one in 1970 and the other in 1978—focused on these very concerns. The investigators surveyed most of the jurisdictions which already authorize jury trials in juvenile delinquency proceedings. They compiled statistical data and queried juvenile judges. Neither study supports the fears about jury trials overloading the juvenile courts. In fact, the reports are notable primarily for what they reveal about the rarity of jury trials in those jurisdictions which allow juvenile delinquents the right to trial by jury.

The 1970 study (Burch & Knaup. *The Impact of Jury Trials Upon the Administration of Juvenile Justice* (1970) 4 Clearinghouse Rev. 345) reported jury trials were requested in less than two percent of the cases heard. (At p. 359.) Furthermore, only a quarter of those requests actually resulted in trial by jury. (*Id.,* at p. 358.) "The child is generally not detained longer for a jury trial than he would have been for a non-jury hearing. . . . For the most part the judges responded that the use of jury trials had no effect on rehabilitation programs. . . . [T]he results of the survey show that where a jury trial is available by statute it is seldom used and creates no burden on the juvenile court system, . . . . None of the data collected indicates that the extension of this right to the remaining states would significantly affect the efficiency of the operation of the juvenile courts." (*Id.,* at pp. 359-360.)

---

[55]Colorado, for example, has guaranteed jury trials in juvenile court since 1903, Oklahoma since 1909, West Virginia since 1936, Michigan since 1939 and Texas since 1943.

[56]See generally, A Comparative Analysis of Juvenile Codes (1980).

[57]These states also had to confront and deal with several issues which can best be classified as bugaboos. How can a juvenile be tried by a jury of his peers when they are too young to serve, moreover, are busy attending school? Is a juvenile mature enough to knowingly waive the right to jury trial? Won't we lose the expertise of judges in appraising the social and psychological factors influencing juvenile crime?

These and similar questions are answered in an appendix to the dissenting opinion in *McKeiver* v. *Pennsylvania, supra,* 403 U.S. 528, 563-572 [29 L.Ed.2d 647, 671-676]. Briefly, a juvenile can be tried by an impartial jury of adults. The waiver of jury trial requires no more maturity than the waiver of counsel or the decision to plead guilty. The judge's presumed expertise in weighing social and psychological factors can still come into play where it counts—the dispositional phase—after the jury has determined whether the juvenile actually committed the charged crime.

The 1978 study (Note, *The Right to a Jury Under the Juvenile Justice Act of 1977,* Appen. B (1979) 14 Gonz. L.Rev. 401, 420-421) reported similar results. The frequency of jury trials as a percentage of delinquency petitions filed ranged from a little over a third of a percent in Alaska to a little over three percent in Denver, Colorado.[58] The average time to disposition for juvenile jury trials in Boston was only 36 days. The official responding for the State of Texas, the largest jurisdiction with a right to jury trial in juvenile delinquency cases, reported "It is my personal opinion that jury trials in juvenile cases have little impact on the court system."[59]

---

[58]The following chart summarizing the findings of the 1978 study was published in Note, *The Right To a Jury Under the Juvenile Justice Act of 1977, supra,* 14 Gonz. L.Rev. at page 421.

| State[1] | Alaska | Colo. | Mich. | Mass. | Mont. | N.M. | Okla. | Texas | W. Va. | Wyoming |
|---|---|---|---|---|---|---|---|---|---|---|
| Statute | Case Law[2] | 19-1-106 | 712 A.17 | 119 §56 | 10-1220 | 13-14-28A | 10-1110 | Fam. Code 54.03 | 49-5/6 | 14-115.24 |
| Had Juries Since | 1971 | 1903 | 1939 | 1971 | 1943 | | 1909 | 1943 | 1936 | 1951 |
| No. of Jurors | 12 | 6 | 6 | 6 | 12 | 12 | 6 | 12 | 12 | 12 |
| Verdict | 5/6 | Unan. | Unan. | Unan. | 2/3 | Unan. | Unan. | 10/12 | Unan. | Unan. |
| Time Limit Until Trial (Custody) | None | None | None | None | 15 days | 30 days | 5 days | 10 days | None | None |
| Juv. Ct. Jurisd. up to Age | 18 | 18 | 17 | 17 | 18 | 18 | 18 | 17 | 18 | 18 |
| Min. Age for Transfer to Adult Ct. | 0 | 14 | 15 | 14 | 16 | 15 | 7 | 15 | No Transfr. Allowed | 0 |
| Frequency of Jury Trials[3] | .36%[4] | 3.2%[5] | 1.8%[6] | 1.7%[7] | | | .56%[10] | 1.5%[8] | | 1.0%[9] |

Notes

1. These are the ten states in which the minor has a right to a plenary jury trial.
2. The Alaska Supreme Court held that juveniles have a right to jury trial under the state constitution. *RLR v. State,* 487 P.2d 27 (1971).
3. The figures on this line represent the percentage of delinquency petitions which eventuate in a jury trial.
4. Letter dated March 20, 1978, from Merle P. Martin, Office of Administrative Director, Alaska Court System.
5. Telephone call and letter dated August 29, 1975 from former Denver Juvenile Court Judge Ted Rubin, of the Institute for Court Management, Denver, Colorado. The 3.2% rate is for Denver only, for 1974. The statewide rate would be considerably lower, as Denver in that year held 63 juvenile jury trials out of a statewide total of about 83.
6. Letter dated April 14, 1978, from Supervisor, Data Control Unit, Wayne County Juvenile Court. The figure is for 1977, Wayne County (Detroit) only. Statewide rate is lower.
7. Letter dated April 3, 1978 from Justice G. Poitrast, of the Boston Juvenile Court. Rate applies to Suffolk County (Boston) only.
8. Letter dated March 28, 1978 from Jim Hutcheson, Chief Counsel, Office of Court Administration, Supreme Court of Texas. The figure is for 1976 (126 jury trials out of 8,280 filed delinquency petitions).
9. Letter dated April 5, 1978, from Judge J. Reuel Armstrong, Court Coordinator, Supreme Court of Wyoming.
10. State of Oklahoma, Report on the Judiciary 1967, p. 217.

[59]At oral argument, the People recited a long litany of administrative problems which would flow from a right to jury trial in juvenile proceedings. However, many items on this list of administrative costs and inconveniences assume juvenile jury trials of necessity would have to be held in the same courtrooms before the same judges as other juvenile delinquency

·3. *The meaning of an "inviolate" constitutional right.*

As has been observed earlier in this opinion, the right to jury trial inheres in the individual person and its scope is defined by what Englishmen enjoyed in 1850.[60] The right as so defined is *inviolate* and does not yield to policy considerations. Concerns about how jury trials might disrupt the informality, speed and non-adversarial nature of juvenile court, even assuming those descriptions were true, cannot defeat the constitutional right to jury trial. For this right is not based on flexible notions like due process and equal protection where courts frequently balance governmental burdens against private benefits in deciding whether to declare a constitutional right. Instead the right to jury trial guaranteed by article I, section 16 is in the same league as the Sixth Amendment right to counsel.

Like the right to counsel, the jury trial guarantee is express and specific. It is one on a rather short list of fundamental protections against arbitrary or oppressive government. Indeed it lies at the heart of the basic compact between individual and society which is the hallmark of our democracy. Thus the right to trial by jury must be honored no matter the cost or inconvenience to government. (Cf. *Corenevsky* v. *Superior Court* (1984) 36

---

trials. In fact another option is legally available. Juveniles requesting jury trial could be sent to the adult criminal court for trial then referred back, if convicted, for disposition hearings in juvenile court. The courtrooms would not have to be refurbished, juvenile court schedules and judicial assignments would not have to be disrupted, and the like.

On the other hand, it would not be constitutionally permissible to offer the option of nonjury trial and treatment as a juvenile offender in juvenile court versus jury trial and treatment as an adult offender in criminal court. To the extent there remains any difference whatsoever between the treatment accorded convicted juvenile and adult offenders, forcing a juvenile accused to this election would place an unconstitutional burden on the exercise of his right to trial by jury. (*United States* v. *Jackson* (1968) 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209] [kidnaping law permitting jury to impose death penalty but no death penalty after court trial or guilty plea "imposes impermissible burden upon the exercise" of constitutional right to jury trial]; *In re Lewallen* (1979) 23 Cal.3d 274 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823] [imposing higher penalty for exercising right to jury trial is unconstitutional].)

[60]In this opinion, we do not reach the issue of whether juveniles charged in juvenile court with offenses which would only amount to a misdemeanor should be entitled to demand a trial by jury. The defendant in this case, Javier A., was charged with attempted murder, clearly a felony. Indeed he was committed for a term of over 15 years. Through the 1847 statute described earlier (see pp. 936-937, *ante*) the English common law authorized summary trials followed by limited incarceration for young people accused of thievery and other minor crimes. Accordingly, a tenable argument can be made juveniles did not enjoy the right to jury trial when charged with offenses amounting to misdemeanors at the critical point in English legal history when California became a state. If English juveniles did not have this right when accused of misdemeanors, the California constitutional right to jury trial would not extend to California juveniles charged with similar transgressions whether delinquency cases are construed as wardship actions or criminal prosecutions.

Cal.3d 307 [204 Cal.Rptr. 165, 682 P.2d 360] [county officials compelled to supply funds needed to provide criminal defendant effective assistance of counsel].)

If juries indeed are inimical to juvenile court proceedings, the right should have been taken away by constitutional amendment when juvenile courts were first created in California. This very route was followed when it was deemed desirable to eliminate jury trial in workers' compensation proceedings. (Cal. Const., art. I, § 14, art. XIV, § 4; *Dominguez* v. *Pendola* (1920) 46 Cal.App. 220 [188 P. 1025].) In the absence of an amendment of this nature, the juvenile offenders' right to trial by jury remains inviolate in the eyes of the California Constitution and thus should be restored.

## IV. CONCLUSION.

We have no trouble whatsoever in affirming the trial court's denial of appellant's motion to suppress evidence. The denial of Javier's request for trial by jury is an entirely different matter. However we construe California juvenile delinquency proceedings, he was entitled to a jury trial under the Constitution.

If we take the juvenile delinquency provisions at face value, the court was determining whether Javier had committed a felony and on that basis declaring him to be a ward of the court. If so, he should have had the opportunity for a jury trial because in 1850 England minors had such a right before they could be declared wards of the court. On the other hand, if we take a close look at what has happened to juvenile delinquency cases in the past 60 years it is disingenuous to call the 1984 version a wardship action or indeed anything other than a criminal prosecution. Accordingly, once again Javier A. should have been granted trial by jury since minors, as well as adults, enjoyed a right to jury trial in 1850 England—and continue to in present day California—when prosecuted in criminal proceedings.

Ordinarily previous Supreme Court decisions are discarded, if ever, because of altered social circumstances or new societal values. "[T]he ideas of the community and of the social sciences, whether correct or not, as they win acceptance in the community, control legal decisions." (Levi, *An Introduction to Legal Reasoning* (1948) 15 U.Chi. L.Rev. 501, 504.) It is for the Supreme Court and only the Supreme Court to tell us when social conditions have changed enough or new values have matured sufficiently the time has come to abandon that court's old rule and adopt a new one. But

the juvenile offender's constitutional right to trial by jury is not a question of evolving social conditions or values. It is a matter of historical fact. And if this court is correct in its historical analysis, *Daedler* is not merely out of date or out of step; it was wrong on the day it was filed. As a result of that error, thousands of juveniles have been denied their constitutional right to jury trial over the past 60 years.

We urge the Supreme Court to end this deprivation of fundamental constitutional right. In doing so, we commend to the court's attention the words of Thomas Jefferson: "Equal and exact justice to all men, of whatever state or persuasion . . . and trial by juries impartially selected. These principles form the bright constellation which has gone before us, and guides our steps. . . . should we wander from them in moments of error . . . let us hasten to retrace our steps and to regain the road. . . ." (Jefferson, First Inaugural Address, Mar. 4, 1801.)

### DISPOSITION

In compliance with principles of stare decisis enunciated in *Auto Equity,* the judgment is affirmed.

Thompson, Acting P. J., concurred.

**FIELDHOUSE, J.,**[*] Dissenting.—Although one cannot advocate the "willy-nilly" side-stepping of case law by selectively fancying distinctions, there occurs from time to time major distinctions which have been brought about gradually by social and legal evolution, and these occasional, contemporary situations must be rescued from seemingly controlling cases lest we become enslaved by *Auto Equity.* Certainly the growth and development of juvenile justice, which has been ably described by the majority, is a shining example of one such distinction.

Obviously the right to a jury is a matter of fundamental justice. Contemporary juvenile law is in no way comparable to the system addressed by the *Daedler* court. I do not suggest a change in the law. Rather I advocate an application of existing, tried and true legal principles to a completely new and heretofore unchallenged situation.

I agree wholeheartedly with my (step)-brothers in the majority opinion with respect to their reasoning. But I would reverse the judgment and remand for a new trial where appellant was afforded his constitutional right to trial by jury.

[*]Assigned by the Chairperson of the Judicial Council.

Appellant's petition for a hearing by the Supreme Court was denied November 21, 1984. Bird, C.J., and Reynoso, J., were of the opinion that the petition should be granted.